Argued February 11, affirmed April 21, 1925.

# IVY RAMSEY ET AL. *v.* THE WELLINGTON CO.

### (235 Pac. 297.)

**Principal and Agent—Declarations of Agent as to Fact or Extent of His Authority are Incompetent—Agent may Testify as to Existence and Terms of Agency.**

1. Declarations of agent as to fact or extent of his authority are incompetent to prove his agency, but he may testify as witness in proper case as to existence and terms of agency; inhibition being against hearsay testimony about agent's extrajudicial statements.

**Corporations—Evidence Held not to Show That Secretary of Corporation had Authority to Contract Concerning Corporation's Realty.**

2. Under Sections 808, 6867, Or. L., making void agreements relating to realty made by agent of party to be charged, unless authority of agent be in writing, evidence *held* not to show authority of corporation secretary to contract concerning its realty.

**Specific Performance—Court cannot Specifically Enforce Agreement not Specific in Its Items.**

3. Court cannot specifically enforce agreement not specific in its items.

**Specific Performance—Court Could not Specifically Enforce Oral Agreement to Renew Lease not Specifying Length of New Term or Rental.**

4. Court could not specifically enforce oral agreement between lessor and assignees of written lease to renew lease, where neither length of new term nor rental thereunder were specified, but were left open to further settlement.

**Frauds, Statute of—Renovations by Assignees of Lease Held not Part Performance of Oral Agreeement for Extension Thereof, Taking It Out of Statute.**

5. Under written lease requiring lessee to keep premises in good order and repair, renovations by assignees thereof merely carried out such obligations and were not part performance of alleged oral agreement to renew lease so as to take it out of Section 808, Or. L., requiring lease for more than one year to be in writing.

See (1) 2 **C. J.** 933, 935, 938.   (2) 14a **C. J.** 408.   (3) 36 **Cyc.** 588. (4) 36 **Cyc.** 587, 596, 598.   (5) 27 **C. J.** 349.

## From Multnomah: T. E. J. DUFFY, Judge.

1. Admissibility of declaration and acts of agents, see note in 131 **Am. St. Rep.** 618.  See, also, 21 **R. C. L.** 820.

2. See 7 **R. C. L.** 620.

3. See 25 **R. C. L.** 206, 219.

5. See 25 **R. C. L.** 567.

Department 1.

'AFFIRMED.

For appellants there was a brief over the names of *Mr. John F. Logan* and *Mr. Isham N. Smith,* with an oral argument by *Mr. Smith.*

For respondent there was a brief over the names of *Mr. W. P. LaRoche* and *Mr. J. B. Offner,* with an oral argument by *Mr. LaRoche.*

BURNETT, J.—This is a suit for the specific performance of an alleged parol agreement to lease real property for a term longer than one year. The realty in question is a set of apartments on Lots 1 and 4 in Block 102 of Couch's Addition to the City of Portland, owned in fee by the defendant. A lease of this property was made August 15, 1916, to Helen Ingerslev for three years with an option for an additional two years from August 15, 1919, to August 14, 1921, at a rate for the optional term to be agreed upon by the lessor and lessee and in case agreement could not be reached, the rental charge was to be arbitrated with power to the arbitrators to fix it at not less than $300 per month. It was further covenanted that the lease could not be transferred or the premises sublet without the written consent of the lessor being first obtained. With the consent of the lessor the original tenant assigned the lease to Brown. Afterwards, in pursuance of a resolution of its board of directors, the defendants authorized the extension of the term of the lease for two years as provided in that document at a rent mutually agreed upon. On January 31, 1921, according to the complaint, Brown assigned to the plaintiffs for value all his right, title and interest in and to the lease as extended, to which transfer the company by

its secretary, D. E. Lofgren, gave its written consent
under seal of the company. Thus far the parties
are in substantial accord as to the facts. The plain-
tiffs, however, assert in substance that the lease as
extended to Brown terminated on August 14, 1921, or
about six months after they bought Brown's interest,
and they say that as part of the consideration for
them taking the assignment, and prior to payment by
them of any consideration to Brown for his interest,
they agreed with the defendant, acting through its
secretary, that the defendant would agree to and did
agree to and did then and there extend the time for
said lease for three years additional, or until August
15, 1924. They aver in substance that at the time
of said agreement for the extension they informed
the secretary, and he well knew that they contem-
plated improvement and rehabilitation of the apart-
ment house and its furniture, involving the expendi-
ture of large sums of money, and that that expense
was part of the consideration for the extension of
the term to August 15, 1924, and that the secretary
on behalf of the defendant, with knowledge of all
matters and things averred, consented to and did
extend the term as stated. All this is denied by the
defendant. The plaintiffs aver that as the secretary
had extended the lease as stated, they incurred obli-
gations to the former owner of the lease to the extent
of $7,500, the agreed purchase price of said lease by
plaintiffs from Brown, which they paid to him and
thereafter they entered into possession of the apart-
ments; have fully performed the terms of the lease
and have paid out with the knowledge of the secre-
tary the sum of $1,900 in refurnishing, refitting,
papering, calcimining and painting the interior of
the apartment and were in peaceable and uninter-

rupted enjoyment of the premises until about September, 1921, when the defendant, through its secretary, instituted an action against the plaintiffs for the recovery of the property.

The defendant admits that the plaintiffs paid Brown $7,500 for an assignment of the lease as extended to October 14, 1921, but no longer, and that they had paid the rent for that time. Otherwise, the allegations of the complaint thus far are denied. The arbitration clause in the original lease and the provision for extension thereof is as follows:

"And it is hereby agreed between the parties hereto, that the said Lessee shall have an option to continue this lease for an additional two (2) years from August 15th, 1919, to and including August 14th, 1921 at a rate to be agreed upon by the said Lessor and the said Lessee, and in case said parties do not agree on the amount of rent to be paid by said Lessee to said Lessor for said additional two years, the same shall be left to arbitration in the following manner: The said Lessor shall select one person as arbitrator and said Lessee shall select one person as arbitrator and if these two cannot agree they shall select a third person as umpire, and the decision of two of the three persons shall be final and binding upon said Lessor and said Lessee. The findings in any case to be for a certain and specific sum of money not less than Three Hundred ($300) Dollars per month, payable in advance on the 15th day of each and every month for twenty-four months from the 15th day of August, 1921."

It is averred in the complaint:

"That at the time, to wit: January 31st, 1921, when the said The Wellington Company, acting through David E. Lofgren as aforesaid, agreed to the extension of the terms of said lease until August 15th, 1924, as above alleged, it was agreed that the other

conditions of said lease should be binding, except that the amount of rent to be paid should be determined in accordance with the provisions of the arbitration clause in said lease.''

This allegation is denied by the answer. They avow their willingness and readiness to have the amount of rental they are required to pay fixed under the arbitration clause mentioned, and are willing and ready to pay the rent thus to be fixed, and that unless the specific performance of the agreement is decreed they will suffer irreparable damage, all of which is denied by the answer.

In brief, the contention is whether or not the agreement was made as stated, and as a question of law, whether it is sufficiently specific to enable the court to enforce specific performance thereof. The defendant denies any contractual relations with the plaintiffs after August 14, 1921, the date of the expiration of the extension authorized by the original lease. The Circuit Court after hearing the evidence and considering the case, entered a decree dismissing the suit and the plaintiffs have appealed.

In their negotiations with Brown, their immediate predecessor, the plaintiffs, at his suggestion, went to the office of Lofgren, who was the secretary of the defendant, and he is the only officer that the plaintiffs met or with whom they negotiated in all their transactions. Lofgren was also one of the three directors. The other two were the Misses Shogren. The Shogrens and Lofgren owned a majority of the stock of the corporation, amounting to 300 shares. The other 200 of the 500 shares extant were owned by other parties not here involved.

Quoting the testimony of Miss Ivy Ramsey, one of the plaintiffs, it appears that they went to the office

of Lofgren to arrange for the transfer of the lease, and she said in answer to a question:

"We went in and Mr. Brown and Mrs. Mulkey and Miss Burke was there and my sister and myself and we paid over to Mr. Brown, gave him the check, and Mr. Brown said, 'At one time I could have bought that for $30,000,' and Mr. Lofgren said, 'You cannot get that now.'

"Q. That was buying the building? A. Yes, and right there Mr. Austin said, 'Is that in the market?' And he said, 'No, it is not on the market,' and then we talked around there and before we signed the papers we said to Mr. Lofgren, 'What about the extension?' and Mr. Lofgren said, 'That will be all right, Mr. Austin, don't worry about that, it will be all right.' And Mr. Austin said, 'Put that in writing.' And Mr. Lofgren said, 'My word is good, don't worry about that, my word is good.' And Mr. Austin said, 'What about the rent?' And he said, Mr. Lofgren said, 'I will have to write to the Shogren Sisters at Mosier to see about the rent,' and he said that it would be arbitrated as provided in the lease that we held, and we closed the deal."

She describes the uncleanliness of the apartment and says she told Lofgren of the terrible condition and told him that they were going to fix up the property, clean it all up and put their furniture in it. She further says that they renovated the interior of the building and in doing so incurred expenses of $1,900. She testifies that once while they were engaged in the renovation, Mr. Lofgren and the Shoren Sisters called at the apartment and saw what they were doing. On cross-examination this witness declared that they went twice to see Lofgren, and the first time they were there:

"Why, he inquired, he asked for references for all of us, wanted to know whether we were capable

and experienced and he would have to write to the Shogren sisters for the transfer of the lease and tell them about us.   After making inquiries we came back in a couple of days or so.

"Q. Did you give him references as to who you were and what you were doing?  A. Yes, he asked especially of Mr. Austin about my experience and I gave it to him.

"Q. And then he said he would write to the Shogrens?  A. Yes.

"Q. And tell them all about you?  A. Yes.

"Q. And that he would recommend the transfer. A. Yes.

"Q. And for you to come back in two days? A. I don't remember just how long it was, it was short.

"Q. Who went back to see what the Shogrens' reply was?  A. All went back.

"Q. All of you went back?  A. Yes.

"Q. And what did he say the answer was?

"A. He said it was all right, that it was very satisfactory.

"Q. And that consent was given?  A. Yes.

"Q. And it was shown to you?  A. Yes.

"The Court: Was that consent as to the transfer as between Mr. Brown and yourselves, or did you understand the consent to be the sale of the property and the extension of the lease?

"The Witness: The transfer of the lease.

"The Court: I asked if it included both or just the one.

"The Witness: Just the one.

"The Court: The sale of the property?

"The Witness: Yes, the sale of the property, that is, the way I understand you to be this.  I answer you, if I understand right, that they were favorable. He wrote in regard to the transfer of the lease to us, after telling or giving them the references, and they answered that it would be favorable.  The extension wasn't mentioned at that time at all, about writing about the extension, there was nothing said

about writing about an extension, is that what you mean?

"The Court: Yes, just the sale, so far?

"The Witness: Yes, just the sale. * *

"Q. When you took it up with Mr. Lofgren, what did Mr. Lofgren say? A. He said there would be no trouble at all, that we would get the extension but you would have to have it from three to five years, and Mr. Austin said, 'Put that in writing,' and Mr. Lofgren said, 'No, that is all right, my word is good,' and Mr. Austin wanted to know about the rent, he wanted to know what the rent would be, and he said that he would have to write to the Shogren sisters about that. And we thought it would be arbitrated as it is agreed in the lease. We were not worrying at all, had perfect faith about the extension and anything like that."

Mrs. Austin's account on direct examination is as follows:

"A. Well, we were looking for apartment houses and we met Mrs. Mulkey through looking for them and she was trying to find us a place to buy and she went in to Mr. Brown and listed the place and took us up to show it to us, and we saw the place was in a very run down condition, but we thought that we could clean it up and make it a better place and could realize our money out of it if we had long enough to stay there. And we asked Mr. Brown how much of a lease he had and he said that the lease expired August the 15th of this year, which was six months from that time, and we asked him at the time if we could get an extension of the lease, and he said, 'Yes, sir,' that he was sure that there was no doubt of us getting an extension, so then he had us go down and meet Mr. Lofgren and Mr. Logfren asked us what we were going to do when we got the building and we said that we were going to clean it up, that it would take a great deal of money to put it in shape for the type of tenants we wanted.

Well, he said he wanted to know if we had had experience, and we·said, 'Yes,' and he said that he would write to the Shogren sisters in regard to the transfer of the lease and for us to come back. So we came back, I believe, two days later, I know it was the thirty-first of January. Mr. Brown and my husband and my sister and Mr. Mulkey, Miss Burke and myself were there. * * We asked Mr. Lofgren if there was any doubt about us getting the extension of the lease, and he said, 'No.' My husband asked him if he would put that in writing and he said 'No,' that it was not necessary, that his word was good, and there was no need of a lease being taken up until later. It was near the expiration of the lease. So Mr. Brown spoke up and said that at one time he could have bought that building for a certain sum and my husband immediately asked him if the building was on the market for sale and he said, 'No,' that it was not, but he said that if it went on the market for sale that he would give us the first opportunity to buy it, and then my husband said, 'Well, now, Mr. Lofgren, we are putting all we have got in the world in this and we are depending on your word that we will get the extension.' And he told us not to worry, that we would get it.''

Speaking of the second interview with Lofgren, the plaintiff H. A. Austin testifies as follows:

''Monday, Mr. Lofgren asked us what we were going to do with the place if we took it over, and we told him that we were going to clean it up. It was dirty. Some of the apartments were buggy. It needed new carpet on the floors, and some of the beds were in bad condition. The walls needed calcimining and painting, and he said, 'That is all right, that is just the kind of people that we want in there.' And then I asked him about the extension of the lease, 'Are you sure that we can get the extension?' and he said that we would. We said that, 'We are putting all our money in this and we don't want to take any

chances,' and he said, 'You can be assured that you can have the lease for from three to five years.' And then I asked him if the place was for sale and he said, 'No, if it was for sale that he would give us the first opportunity to buy it.' "

Respecting the second interview with Lofgren, this witness testified as follows on cross-examination:

"Q. And I understand you to say that Mr. Lofgren asked you the direct question what you intended to do with the place if you took it over, by that meant if you concluded your deal with Mr. Brown? A. What we were going to do with the place.

"Q. Yes, and you said, calcimine it and paint it up and put it in fairly good condition? A. Yes.

"Q. And he said that you were the kind that they were looking for? A. Yes.

"Q. And he meant by that, that you would make desirable tenants? A. Yes.

"Q. That is the way that you took it? A. Yes.

"Q. Did he promise to give you the answer that he would secure from the Misses Shogren in case you got an extension of the lease? A. You mean in regard to the rent?

"Q. He was going to take that matter up with the Shogren Sisters. A. Yes, he was going to take that matter up with the Shogren Sisters.

"Q. Did he promise at any definite time to let you know what their answer was? A. At any time before the 15th of August, he would let us know what the rent would be. He said he was going to tell us what the rent was going to be for the extension of the lease.

"Q. Did he ever do that? A. No, sir.

"Q. Did you ever go back to him and ask him what the rent would be? A. At the time that Mrs. Austin and I went there we asked him what the rent would be, and he said then that he did not know what it would be.

"Q. Is that the only visit that you ever paid to him? A. That is the only visit that I was there."

Speaking of the transaction the witness Lofgren testified thus:

"I think that the first time that this matter was up, that Mr. Brown came alone and made inquiry as to the getting of an assignment of the lease and the next day, I think it was on the 27th, that Mr. Brown and Miss Ramsey and Mr. and Mrs. Austin came to the office, and I told them at that time, that before I took the matter up with the Shogrens, it would be necessary to meet the people and find out more about them, get their references so that I might communicate all the information that I had to the Shogrens, which I did. On the same day, I wrote a letter to Miss Ann Shogren, at Mosier, Miss Ann Shogren having taken more of the executive work on her shoulders than did her sister May, May Shogren who at that time was in Portland, and I was trying to locate her by phone, but I was not able to locate her by phone the afternoon that I wrote this letter. I had learned from her nephew's wife or someone up at the Shogren home or in the neighborhood that Miss Shogren was in the city and I could perhaps get in touch with her later in the evening, but in order to hurry the matter along, as Mr. Brown and the Austins seemed to be quite anxious to close the deal, I thought I had better write to Mosier and get her consent, and while that letter was going to Mosier, and the reply coming back, I could get in touch with Miss Shogren, who was in the city.

"Q. That was the letter that was introduced here? A. Yes.

"Q. January 27th was your letter? A. Yes, and Miss Ann Shogren gave her consent in writing and I talked to Miss May Shogren, personally.

"Q. Did she consent? A. Yes, they both consented, and when the Austins were there, I informed them of the fact that I was acting at attorney for the Shogren sisters in the matter, and also was acting as Secretary and that all transactions for the

Wellington Company of every kind and nature were subject to the approval of the Shogren sisters. * *

"Q. Now, what, if anything, was said in regard to the extension of the Brown lease after it expired?

A. The first time that Mr. Brown was there, I asked him if he knew that the lease expired on August the 15th, 1921, and he said that they did. And I asked him, 'Did you say anything to the Austins about a new lease?' and he said, 'Yes, I did, and I told them that I didn't think that the rent would be over $650.'

"Q. Who did you tell that to? A. Mr. Brown told that to me.

"Q. That was Mr. Brown's statement to you?

"A. Yes, that was Mr. Brown's statement to me, afterwards, when the Austins were up there, there was some general talk about the Wellington, and the question was incidentally mentioned as to a lease after August 15th, 1921, and I mentioned then that the property was for sale. The Shogrens were desirous of selling their interest in the Wellington, and that they were more anxious to sell than to make a new lease, but in the event that they didn't sell, they would, no doubt, be very glad to give the Austins a new lease, particularly if they proved to be satisfactory tenants.

"Q. Was the time of the lease discussed? A. Well, yes, sir, I said that the price would depend somewhat on the length of the lease.

"Q. For the period of the lease, was the period of the lease discussed? A. Well, we discussed two or three years, perhaps would be one price and five years, perhaps, would be another price.

"Q. Was there a contract actually made? A. No, none whatever.

"Q. Did they ask you to take the matter up with the Shogren Sisters to see what the rent would be? A. I don't recall of any definite request made as to that, at that time."

Concerning the second interview with Lofgren, the witness Brown, grantor to the plaintiffs, gave testimony as follows:          °

"Q. Just state what was said, what was said in regard to a new lease being acquired by Miss Ramsey and Mr. and Mrs. Austin. A. Well, the idea was conveyed to them that the building was for sale and that if it didn't sell, they would take the matter up with them, and it was always im-·pressed on my mind by Mr. Lofgren and also the Shogren Sisters, I have interviewed them a time or two, that they would be glad to have me buy their stock, and I had expressed some hopes that I would be able to later on, to get some of my friends to assist me.

"Q. Now, when Miss Ramsey and Mrs. Austin dealt with you about buying out your interest in the lease, was it based upon a consideration that they would receive a new lease or an extension of the lease or otherwise they would not buy from you? A. Why, as near as I can tell, they took it subject to the same opportunity of getting a lease as I would have.

"Q. Did they tell you, Mr. Brown, that they would not buy from you unless they could get an extension or a new lease? A. No.·

"Q. Did you hear them tell that to Mr. Lofgren in his office? A. No, I did not.

"Q. Was there anything that happened in all the conversation that led you to believe that was the case that whether they could get a new lease would decide whether they would purchase the property from you or not? A. No. Mr. Austin, some little time after the deal was made, passed the remark that they had taken somewhat of a gamble in regard to the new lease.

"Q. You say Mr. Austin said that? A. Yes.

"Q. That they had taken somewhat of a gamble as to whether they would get a new lease or not? A. Yes."

In common with all other corporations, the defendant is subject to the statutory rule that

"From the first meeting of the directors, the powers vested in the corporation are exercised by them, or by their officers or agents under their direction, except as otherwise specially provided in this Chapter." Or. L., § 6867.

In all the testimony, all the plaintiffs have to rely upon imputing authority to Lofgren to bind the corporation to execute a new lease are the fact that he was secretary of the corporation and his own verbal declaration which they impute to him that he had authority to bind the defendant and that all its business passed through his hands. In *Crawford v. Albany Ice Co.,* 36 Or. 535 (60 Pac. 14), Mr. Justice Robert S. Bean, speaking for the court, said:

"It is elementary law that the president and secretary of a corporation, as such, have no power to bind the corporation by the execution of promissory notes or other contracts, but such authority 'must be derived from some bylaw of the corporation, or some special order, or must be implied by some acquiescence or ratification on the part of the corporation, whose powers, under our law, are exercised by the directors,' " citing several precedents. See, also, *Wilson v. Investment Co.,* 80 Or. 233 (156 Pac. 249); *Bell & Co. v. Vogt,* 87 Or. 102 (168 Pac. 724).

1. The declarations of an agent as to the fact or extent of his authority are not competent to prove his agency: *Connell v. McLaughlin,* 28 Or. 230 (42 Pac. 218); *Jones v. Marshall-Wells Co.,* 104 Or. 388 (208 Pac. 678). This principle, however, does not disqualify the agent to testify as a witness in proper cases as to the existence and terms of his agency. The inhibition is against reliance upon hearsay testi-

mony about his extrajudicial statements on the subject as proof of agency.

It is said in Section 808, Or. L.:

"In the following cases the agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents, in the cases prescribed by law: * *

"6. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of any interest therein;

"7. An agreement concerning real property made by an agent of the party sought to be charged unless the authority of the agent be in writing; * * ."

2. Under this statutory rule there is no evidence in the record that Lofgren was an agent of the defendant or had any authority whatever to make a contract concerning the real property in question, no writing giving him such authority having been put in evidence. It will be noted also that the arbitration clause in the former lease applied only to the two year extension provided for in that instrument and that but one extension was specified in that demise. The situation then was one which would require substantially a new lease, as all the terms of the former lease expired with the single extension mentioned therein.

3–5. The plaintiffs are here seeking to enforce specific performance of a vague, uncertain, oral agreement, said to have been made by an agent of the defendant upon whom no authority for that purpose emanating from the defendant has been shown to have been conferred. The agent himself

114 Or.—24

denies even what is imputed to him by the plaintiffs, but taking them at what they have said, their testimony is wholly incompetent to support a contract sufficient to invoke the power of the court to compel specific performance. The court cannot specifically enforce an agreement which is not specific in its terms. Not only the length of the new term, but also the rental to be paid are both uncertain. There is no part performance of the agreement sought to be enforced. Clearly, by the testimony of the plaintiffs themselves, the terms of the new agreement were left open for further settlement. They entered possession of the premises under the former lease as assignees thereof. What they did there in the way of renovation was a duty specially imposed upon the tenant by the terms of the lease under which they entered. That document provides:

"That the lessees will * * during the period of this lease, at their own expense, keep and maintain all the interior parts of said premises in good order and repair, * * ."

Having bought the lease and entered thereunder without any agreement based upon a sufficient consideration for a new lease they became bound to do everything they have said they did in the way of renovating the establishment. Clearly, all their operations are by virtue of the lease of which they were assignees, and it cannot be urged as part performance of the alleged new parol lease: *Dechenbach* v. *Rima*, 45 Or. 500 (77 Pac. 391, 78 Pac. 666). That was a case where, as in this instance, the plaintiff claimed that he bought out a tenant on the verbal assurance of the landlord that he would execute a new lease to the plaintiff at the expiration

of the term he purchased. After he had expended his money and entered under his assignment, the landlord abjured his alleged promise and refused to make a new lease. The court there said:

"Now, in the case in hand, there was no false representation or concealment of any fact by the plaintiff that induced the defendant to purchase Lake's business. The only contention is that in making such purchase he relied on the verbal promise of the plaintiff that, if he would buy the business, the plaintiff would thereafter execute to him a lease of the premises for more than one year. This contract was void by the statute of frauds and is therefore void for all purposes. It conferred no right upon the defendant and created no obligation on the part of the plaintiff."

The case is identical with the one at bar and is controlling here. See, also, *McKinney* v. *Hindman*, 86 Or. 545 (169 Pac. 93, 1 A. L. R. 1476).

All these principles of law confronted the plaintiffs when they negotiated concerning the matters here involved and it was their duty to have used reasonable care to protect themselves within those rules if they would recover here. Their own conduct and lack of care of their own concerns has placed them beyond the pale of relief in a court of chancery which must be governed by the statutory precepts affecting the issue. The decree of the Circuit Court is affirmed.                                              AFFIRMED.

McBRIDE, C. J., and RAND and COSHOW, JJ., concur.