Argued June 3, affirmed July 8, 1953

# POKORNY *v.* WILLIAMS
### 260 P. 2d 490

*Marvin Swire,* of Portland, argued the cause for appellant. With him on the brief were Rosenberg, Swire & Coan, and Seymour L. Coblens, all of Portland.

*Robin D. Day,* of Salem, argued the cause and filed a brief for respondents.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

BRAND, J.

The plaintiffs brought this action against Ralph E. Williams, Jr., doing business as Williams & Hart, to recover $2,914.24 alleged to have been the "market price" on October 6, 1947, of 3,703 pounds, less tare of 95 pounds, of hops at 78 cents a pound. The action is based on a contract for the sale and purchase of hops. The verdict and judgment were in favor of plaintiffs in the sum of $2,633.84. Defendant appeals.

A contract was made by Frank J. Pokorny and his son Clifton Pokorny with Williams & Hart. It provided in part that "the Seller does hereby sell and agrees to deliver to the Buyer entire salable crop estimated 18,000 pounds, more or less (18,000 lbs.) net weight of his crop of hops of the growth of the year 1947, now being or growing, or to be grown on" eighteen acres therein described. Other provisions were:

"The Seller also agrees to cultivate, carefully dust and/or spray when necessary and in proper season; cleanly pick, properly dry, cure and bale, and prepare for market, all the hops grown on said lands in a good and husbandman-like manner, and in like manner to put all said hops in bales of 185 pounds to 210 pounds gross weight each, in new twenty-four (24) oz. baling cloth, if available, using a sufficient quantity of cloth for such purpose on each bale.

"The Seller further agrees and warrants that said hops shall be of prime quality, in sound condition, cleanly picked, of even color, properly dried and cured, matured, but not over-ripe, flaky, and free from mould and sweepings; and that said hops shall not be the product of a first year's planting, and to use only the best grade of American sulphur in curing, and to sew each bale with eight ply twine, using a full lock stitch not more than three inches in length.

\* \* \* \* \*

"The Buyer agrees to pay to the Seller, as the purchase price of said hops, the ceiling price as established by the O.P.A. or other governmental agency as such price exists on October 31, 1947. In the event that no ceiling price shall have been established by October 31, 1947, the price shall be the highest market price paid grower for hops of like quantity and quality on delivery date above agreed upon, but in no case shall it be less than 35¢, in the event of no ceiling.

\* \* \* \* \*

"The Buyer agrees to pay the purchase price of said hops, less advances, upon the delivery and acceptance of said hops.

"The parties hereto further agree as follows:

"FIRST—From each bale of said hops there shall be deducted five (5) pounds as tare.

\* \* \* \* \*

"FOURTH: Should the hops for any cause be of lesser or lower quality than called for in this contract, the buyer shall nevertheless have the privilege of taking same, or so many of them as will recover the money advanced on said crop, at a reduction in the price equal to the difference in quality between such hops and those specified under this contract."

Other provisions of the contract are not involved in the controversy and are not set forth here.

Hart died before suit was filed, and defendant Williams answered, representing his partner's estate as well as himself.

The complaint alleges full performance of the contract by plaintiffs, and states that

"On or about October 6, 1947, after said hops had been harvested and baled and placed in Donald Farmers Cooperative Warehouse at Donald, Marion County, Oregon, defendant, RALPH E. WIL-

LIAMS, JR., and Harry L. Hart sampled, weighed, and inspected all of 19 bales of hops and accepted said 19 bales of hops.

"That at said time there was no governmental ceiling price on said hops, and that the market price on that date for hops, the kind and quality of those sampled and inspected and taken in by RALPH E. WILLIAMS, JR. and Harry L. Hart, was seventy-eight cents ($.78) per pound.

\* \* \* \* \*

"That thereafter said RALPH E. WILLIAMS, JR. and Harry L. Hart repudiated said agreement hereto attached and marked 'Exhibit A', and their agreement to take said hops on October 6, 1947, and declined to pay for same, giving no grounds therefor."

The complaint alleges that by reason of the facts, the defendant became indebted to plaintiffs in the sum of $2,914.24, with interest from 6 October 1947, and that demand for payment had been made and refused. The answer, in addition to certain admissions and denials, affirmatively alleges

"THAT on or about October 6, 1947, Plaintiffs tendered to Defendant certain hops in attempted and purported compliance and conformance of Plaintiffs' covenants, and of the terms and conditions of the written contract alleged and set forth in Plaintiffs' amended complaint.

"THAT Defendant inspected samples thereof and found that said hops were defective and not as warranted and not of the condition referred to in said written contract in the following particulars:

"(a) Said hops were not dusted as provided in said contract.

"(b) Said hops were not cleanly picked as provided in said contract, and contained an excessive amount of leaves and stems.

"(c) Said hops were not cultivated as provided in said contract.

"(d) Said hops were not free from mold.

"(e) Said hops were not of prime quality.

"THAT based upon each and all of the foregoing breaches of warranty and the terms, covenants and conditions of said contract, Defendant rejected the tender of said hops and refused to, and did not accept the same."

The reply was a general denial.

Defendant makes two assignments of error. By the first he asserts:

"The court erred in denying appellant's motion for a judgment notwithstanding the verdict and the appellant's motion for a directed verdict which was made in a due and timely manner. The court below should have granted said motions on either or both of the following grounds:

"(a) That there was no substantial and competent evidence that the appellant intended to accept the hops and, on the contrary, the undisputed evidence shows that the appellant did not intend to accept the hops, and hence title did not pass."

Assignment of error No. 1 (b) was waived at the hearing in this court and will not be discussed.

■ When a motion for a nonsuit or directed verdict is denied, the grounds stated therein are conclusive on the moving party, and he may not urge for the first time on appeal additional grounds for the motion. *Edvalson v. Swick,* 190 Or 473, 227 P2d 183. We therefore set forth the grounds specified by defendant in his motion:

" * * * The grounds for this motion are as follows: One, there is no substantial or any competent evidence in this cause that the hops were worth the sum of seventy-eight cents or any other sum within the definition of the contract; two, there is no substantial or any competent evidence

in this cause that the defendant accepted the hops, and on the contrary the evidence affirmatively shows that the defendant did not accept the hops. Three, there is no substantial or any evidence in this cause that Netter was authorized to accept the hops, or that any action of Netter upon which plaintiffs may rely was ratified by the defendant. Fourth, upon the further ground that the plaintiffs have not proven in this case that the hops which are the subject of this case, for which they are attempting the recovery of the purchase price, are presently available for the defendant in the same order and condition as on October 6th, 1947, at the time which plaintiffs claim title was transferred to the defendant.''

The issues presented relate to the alleged absence of evidence as to (1) price, (2) acceptance, (3) authority of Netter as agent of defendant, (4) present availability of hops for defendant. The fourth point was waived. A motion for judgment n.o.v. raised the same questions by reference.

■ We will first direct our attention to the sufficiency of the evidence on the issue of acceptance of the hops by the defendant. Since the transaction on which plaintiffs rely as evidence of acceptance involved only the conduct of the Pokornys on the one side, and one Netter on the other, it follows that two of the issues presented by the motion for directed verdict constitute, in reality, a single issue. If the acts of Netter did not bind the defendant Williams, then there was no evidence of acceptance of the hops. If the relationship between Netter and the defendant Williams was such that Williams was bound by Netter's acts, then the question will be whether there was an acceptance of the hops by Netter. In considering both the question of agency and of acceptance, we are to consider only

whether there was substantial evidence to go to the jury, viewing it in the light most favorable to the plaintiffs. Viewing the evidence in this light, the defendant makes the following concession in his brief:

"* * * Taking that view, it would appear that the facts are as follows: On October 6, 1947 the respondents had a conference with the representative of the appellant and at such conference the respondents believed that they were delivering the hops to the appellant and that the appellant's representative had authority to accept the same. * * *"

The tender of the hops by the plaintiffs is sufficiently manifested. The problem relates only to acceptance.

The applicable rule governing acceptance of goods tendered pursuant to contract closely resembles that which relates to the acceptance by an offeree of an offer to a bilateral contract. In the latter case "the acts by which such assent is manifested must be done with the intent to do those acts; but, except as qualified by §§ 55, 71 and 72, neither mental assent to the promises in the contract nor real or apparent intent that the promises shall be legally binding is essential." Restatement of the Law, Contracts, Vol. 1, § 20. "Not mutual assent but a manifestation indicating such assent is what the law requires." Restatement, Contracts, Vol. 1, § 20 a.

Applying this general principle to the matter of acceptance of goods tendered under a contract for sale and purchase, the Uniform Sales Act lays down the specific and controlling rule.

"The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been de-

livered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them." OCLA, § 71-148.

The issue of acceptance vel non may be wholly separate from the question as to whether the goods accepted are in conformity with the requirements of the contract. The section of the Sales Act which immediately follows the one quoted, reads thus:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor." OCLA, § 71-149.

■ The following excerpts from Williston on Sales are applicable:

" * * * The proper meaning of 'acceptance' in the law of sales with reference to the performance of a contract or offer, is an assent to become owner of specific goods when delivery of them is offered by the seller. * *· * Much confusion has been caused in the law of some states by the assumption that acceptance of the goods means not only an assent to become owner of them, but also an agreement that the goods thus received fulfill in every respect the legal obligation of the seller. No such implication, however, is necessarily contained in the word 'acceptance.' " 3 Williston on Sales (rev ed), § 482.

" * * * When, however, the buyer has had opportunity of inspection or waives his right to it,

or to any objection to the goods, he may accept them though not complying with the terms of the contract." 3 Williston on Sales (rev ed), § 483.

Witnesses for plaintiffs testified that plaintiffs "grew the hops, sprayed them, picked and baled them and brought them to the Donald warehouse as usual." They described the process followed in cultivation and testified that they notified defendant that the hops were in the warehouse. Robert Pokorny testified without objection:

"Q Now, do you know what was done with this particular crop of hops in 1947, that your father and Clifton sold to Williams and Hart; do you know whether that was properly taken care of or not?

"A Yes sir, to my knowledge it was, just like any other year."

Mr. Netter "was talking for Williams and Hart". Before the hops were taken in to the warehouse, Netter came to plaintiffs' ranch and talked to plaintiff Frank J. Pokorny and the three sons. He "said that he was going to go to the warehouse and weigh the hops". Netter "said that we should come over there and we should get the warehouse receipt." Witness Lenners, an experienced hop grower, testified in detail as to the process customarily followed by hop men, including the sampling and testing by buyers. He continued:

"A * * * All of the bales have got to match those samples. Then he weighs those. If everything is satisfactory, he weighs those hops. You give him the warehouse receipt and he gives you a check. That's the way it always happened to me.

"Q That's the custom of the hop men?

"A That's the custom."

Witness Eismann was called by the defendant. He was a representative of S. S. Steiner, Incorporated, hop buyers. On cross-examination he testified:

"Q To get down to this question more thoroughly, I will ask you what is usual in the trade when they go in and take samples from a bale and then go back and take the hops in, weigh the hops, whose hops are those after that, the grower's or the dealer's?

"A It is generally considered when they are weighed by the dealer that they are his hops.

"Q When the warehouse receipt is given to the dealer then what; that is, when they are weighed and the receipt given?

"A If they are weighed and the warehouse receipt is given it would be my opinion they are the dealer's hops."

The record indicates that the parties to the contract had dealt with each other over a long period of time. The contract for the 1947 crop, which is involved in this case, was executed in 1943. With these facts in mind we return to the events of 6 October 1947, which is the date of the alleged weighing, inspecting and acceptance of the hops.

Netter had informed plaintiffs that one of the owners would have to be present at the warehouse. The plaintiff Frank J. Pokorny (the father) went to the warehouse accompanied by his son Dan. Netter was already at work when they arrived. Frank Pokorny testified:

"A * * * He had a sample taken, had six or eight bales punched already before we got there. He went through and tested all of it, then he looked that up, and then he said 'It's all right, we will go and weigh.' All them bales he tested and weighed, and he could see how many pounds it was, then he figured that up, everything, then he

tells me how much that made.  Then he handed me that slip.

> (Weight certificate marked Plaintiffs' Exhibit 2 for identification.)

"Q  This Plaintiffs' Exhibit 2, is that the slip?

"A  Yes, that's the slip.

"Q  All right, go ahead and tell what happened.

"A  Then when he handed me this slip, he says, 'Wait a minute, I forgot to ask you something, did you get that warehouse slip?'  I says, 'I nearly forgot, I had it in my pocket.'  I handed it to him, and he says, 'That's all.'  Then he shook hands, and said, 'Everything is all right.' and he says, 'In a few—or a couple—of days, you are going to get a check.'  He says, 'I'll send this right in.'  Then I went home with my son.  That was all there was."

The slip to which plaintiff referred was on a Williams & Hart form and showed the weight of each of 19 bales of hops, totaling 3,703 pounds less tare of 95 pounds, or a net weight of 3,608 pounds.  It was received in evidence.  Daniel Pokorny testified that his father handed Netter the warehouse receipt "After they completed the business there."  Subject to our further consideration of Netter's agency and of an instrument which he induced the plaintiff Frank Pokorny to sign, the testimony which we have reviewed was more than sufficient to take to the jury the question as to the acceptance of the hops by Netter.

The defendant does not question the fact established by his own witness that the weighing and numbering of the bales is the ordinary method by which acceptance is manifested.  He relies upon an instrument to which he secured the signature of one of the plaintiffs, on the basis of which he contends that the "undisputed evidence shows that the appellant [defendant] did not intend to accept the hops, and hence title did not pass."

The instrument Exhibit C which was signed by Frank J. Pokorny, reads as follows:

"October 6, 1947

"It is agreed between the buyers (Williams & Hart) and the sellers herein that the buyer may inspect and draw tenth bale inspection samples from the sellers' 1947 hop crop for the purpose of submitting these samples to the ultimate consumer for acceptance. In order to obviate necessity of going through the hops a second time, the buyer may weigh and number the bales without this action being construed as an acceptance of the hops.

"WILLIAMS & HART

"By Ernest Netter

"Frank J. Pokorny

"(Seller)"

The instrument is not mentioned in the defendant's answer which, though affirmative in form, amounted to a general denial of acceptance of the hops. The plaintiff admitted that the instrument bore his signature. However, the testimony favorable to the plaintiff was, in part as follows:

"Q Did he have you sign anything that day?

"A Yes, what he gave me, that was just a release, to release the hops so they could get them from the hop house.

"Q Did you read it?

"A No, he didn't give me a chance to. He put it right over on the scales and handed it to me, and said, 'You can sign it.'

"Q Well, explain it to the jury.

"A He handed me that slip like this (indicating) and I was going to take it, the scales were like this, and I was standing on the west side and the scales were over here on the northeast side. I took it like this and raised it up, and he said, 'That's

nothing, that's only a release so we can take it out.'

"Q Take what out?

"A What?

"Q Take what out, what did you mean by 'you could take it out'?

"A Take the hops out.

"Q I see.

"A Then when he said that, I said, 'Oh', and I had a pencil already from him, and he held it out in his left hand like this, and I signed it. What was under it, or if there was anything, I can't tell. There could be something in there, he could have put something in there next day, I don't know.

"Q He said they would send the money to you in a few days?

"A He didn't send me anything.

"Q What did he say to you that day, that they would send the money in a few days?

"A In a few days. He says I was going to receive the money in a few days."

When Exhibit C was shown to the witness he testified:

"A Well, that's my signature all right. When that was this way (indicating), I don't know what was under it.

"Q You signed it at that time?

"A Yes, because he said, 'That's a release.' "

Daniel Pokorny testified that Exhibit C was signed *after* the hops were weighed. His father signed the paper but couldn't read very well. He testified further:

"Q Was it folded in any way?

"A Yes, it was.

"Q Folded over so your father couldn't read it?

"MR. SWIRE: Your Honor, I object to that question as leading.

"THE COURT: I will sustain the objection.

"Q Go ahead and tell what happened.

"A After we got them weighed and probed

and sampled, he took that slip out. I didn't understand the business very well.

"THE COURT: Just what happened, what took place.

"A Well, he took that after we were through and said, 'I want you to sign this warehouse release,' so he signed it. That was that.

"Q How was it folded over; if I hand you a piece of paper could you show the jury how it was folded?

"A I believe so. It was folded something like this, so he could sign at the bottom (demonstrating).

\* \* \* \* \*

"Q Was there anything said after Netter took the hops in, about pay?

"A Yes.

"Q What was said about that?

"A He told us our headaches were over now; that was the first impression we were under anyway. He said, 'The money will be there in a few days.' That's the way they did the year before and the years after."

It is inferable from the record that Frank J. Pokorny was a man of foreign ancestry and of modest formal education. He testified, "I'm not a very good reader." His son testified that his father "couldn't read very well," and there is evidence that his hearing was impaired. The testimony quoted tends to prove that he relied upon the representation of Netter that Exhibit C was only a release so that the defendant could take the hops out of the warehouse. If, as the plaintiff testified, Netter represented that Exhibit C was only a release of the hops, then such representation must have been made with knowledge of its falsity, for Netter fully understood the true nature of the instrument.

█ The general rule has been correctly stated by this court as follows:

" * * * 'Under ordinary circumstances a man is not excused from the consequences of signing a paper which he negligently failed to read': Foster v. University Lumber Co., 65 Or. 46 (131 P. 736). A person is presumed to be familiar with the contents of any document which bears his signature: * * *" *Broad v. Kelly's Olympian Co.*, 156 Or 216, 229, 66 P2d 485.

The situation presented in this case in some respects resembles that which arises when releases from liability for personal injury are secured from the injured party. We quote from *Wood v. Young,* 127 Or 235, 240, 271 P 734:

" 'Where the releasor signs a paper under the impression induced by the releasee that he is signing merely a receipt for money already paid, or a release of a part of his claim only, and the effect of the instrument as a general release is misstated and misrepresented, and the releasor is guilty of no negligence in accepting such statement, the release is of no effect. In other words, if the instrument signed is not what the releasor supposed he was signing, mental assent necessary to constitute a binding contract is absent.'

"As to what constitutes a valid release, we take the following from 23 R.C.L., page 386:

" 'To be valid and binding, a release must be executed with full knowledge on the part of the releasor of what he is signing, and with an intention to discharge from liability.' "

In *Wood v. Young* the plaintiff signed a release from liability for injury to person and property in reliance upon representations that the release applied only to his claim for damage to his car. Plaintiff recovered a verdict for personal injuries, notwithstand-

ing the release, and this court held that the question was one for the jury and the judgment was affirmed.

In *Broad v. Kelly's Olympian Co.*, supra, plaintiff accepted a check on which a plain and complete release was written, and plaintiff made "no claim that the provisions of the check were misrepresented to him" and the only claim of deceit was that the release signed was "only a formality." Plaintiff was not told that the instrument was a receipt, and this court held that there was no substantial evidence that plaintiff was deceived into signing the release. However, the court reviewed the decision in *Wood v. Young* with apparent approval, and after discussing that and other cases in which a plaintiff had prevailed notwithstanding the fact that he had signed a release, the court added:

"It will be observed that in none of these cases did the plaintiff have any independent advice—none by an attorney. In at least four of the cases the defendant or his agent gave the plaintiff false advice in regard to his claim. In virtually all of them the plaintiff thought he was signing a receipt, and not a release."

■ In the very recent case of *Whitehead v. Montgomery Ward & Co., Inc.*, 194 Or 106, 239 P2d 226, plaintiff, unable to read all of a release without his glasses, but able to read the words "Final Release" which were in large print, signed it in reliance upon representations that it wouldn't be considered a release and that it was necessary that he sign as a receipt for money paid him. This court, by Justice Tooze, said:

"Also, plaintiff did not have any independent advice. Furthermore, defendant falsely advised plaintiff regarding his claim and, by failing to dis-

close to him the contents of the writing, concealed from him material facts respecting the same. Moreover, plaintiff thought the writing he was signing was a receipt, not a release, a thought he had the right to entertain under the facts of this case.''

Citing with approval *Wood v. Young,* supra.

In his brief the defendant very properly concedes that

"Taking the jury's verdict in the light most favorable to the respondents, we must assume that the respondent Frank J. Pokorny did not know what he was doing at the time he signed Exhibit C.''

He continues:

"However, the fact that the appellant, acting through Mr. Netter, had the respondent sign Exhibit C shows very clearly and without any dispute that in the words of the Supreme Court of Oregon in Nugent v. Auto Insurance Co., supra, the minds of the buyer and the seller had not met. * * *''

The last-quoted excerpt discloses a serious error of law in suggesting that a unilateral secret intent not to accept is conclusive of nonacceptance. Plaintiffs rely upon language taken from the following cases: *Nugent v. Auto Insurance Co.,* 140 Or 61, 13 P2d 343; *Pulkrabek v. Bankers' Mortgage Corp.,* 115 Or 379, 238 P 347; *Naftzger v. Henneman,* 94 Or 109, 185 P 233; *Wadhams v. Balfour,* 32 Or 313, 51 P 642. These cases refer to the materiality of mutual intention to accept and a meeting of minds as essential to proof of acceptance. Our conclusion is not inconsistent with those principles as stated, but it is elementary that intention and meeting of minds are to be acertained from acts manifesting to the other party such intention and meeting of minds. A secret unexpressed intention not to accept is of no avail, as against evidence manifesting to the other party an intention to accept.

Whether Netter or the defendant secretly did not intend to accept the hops is a matter for the psychologist, not for the judge. The judicial question is whether there was substantial evidence that the defendant, through Netter, did any act, in relation to the goods, which was inconsistent with the ownership of the seller. OCLA, § 71-148, supra. Manifestation indicating assent is what the law requires. Restatement of the Law, Contracts, § 20, and comment, supra. The specific terms of OCLA, § 71-148 stating what shall be deemed to constitute acceptance constitute an elucidation and not a contradiction of OCLA, § 71-118 cited by the defendant.

It is unnecessary to decide whether, under all of the circumstances shown by the evidence favorable to their position, the plaintiff was or was not negligent in signing Exhibit C without reading it. The decision may properly be based upon other grounds. It was the contention of the defendant, supported by an offer of proof, that Williams and Hart had instructed Netter "to get that [Exhibit C] signed in the case of Pokorny. *before the weighing took place.*" (Italics ours.) In view of the evidence that weighing and numbering is the customary method of acceptance, and of the plaintiffs' evidence that Exhibit C was not presented for signature until after the hops had been weighed and numbered, it was for the jury to say whether the transaction had been completed with a passing of title before Exhibit C was presented for signature. .

There is an independent ground for upholding the verdict. Even on the face of Exhibit C the provision is merely to the effect that the weighing and numbering was not to be construed as an acceptance. That instrument did not purport to apply to the conduct

of Netter in informing the plaintiffs that they would receive a check and in demanding and receiving the warehouse receipt. There is not a scintilla of evidence that there was anything said or written by Netter which limited the effect of his acceptance of the negotiable warehouse receipt, or of his statement that plaintiffs would be paid for the hops.

■ This court has held that a negotiable warehouse receipt stands for and represents the property, and that a valid transfer of the receipt constitutes a valid transfer of the property. *Adamson v. Frazier*, 40 Or 273, 66 P 810, 67 P 300. We quote:

" * * * Ordinarily, however, it is unnecessary, for a transfer of the property, that the receipt have a formal assignment indorsed thereon, when the delivery was made with an intention to pass title. * * * Moreover, a statute making warehouse receipts negotiable by indorsement does not prohibit their transfer by delivery. The Uniform Warehouse Receipts Act expressly provides that a receipt which is not in such form that it can be negotiated by delivery may be transferred by the holder by delivery to a purchaser or donee." 56 Am Jur, Warehouses, § 44.

Since it does not appear that plaintiff indorsed the warehouse receipts when he delivered them to Netter, the provisions of OCLA, § 60-239 become relevant.

"A receipt which is not in such form that it can be negotiated by delivery may be transferred by the holder by delivery to a purchaser or donee." OCLA, § 60-239.

In *National Union Bank v. Shearer*, 225 Pa 470, 74 A 351, 355, the court said:

" 'It seems to be the general doctrine of Ameri-

can decisions that apart from any statutory provisions a warehouse receipt, like a bill of lading, is the symbol or representative of the goods it is issued for, and that, whether drawn to the owner's order, or to bearer, or simply to the owner, its delivery by the latter is effective as a symbolical delivery of the good themselves, with or without indorsement. * * *'"

If we are to assume that complete title was "transferred but not negotiated," then we must refer to the provisions of OCLA, § 60-242, as follows:

"A person to whom a receipt has been transferred but not negotiated, acquires thereby, as against the transferor, the title of the goods, subject to the terms of any agreement with the transferor. * * *"

Williston, in his general treatise on sales, discusses documents of title and says:

" * * * If the depositor had title to the goods when he deposited them, and the transferor had title to the document when he transferred it, then though indorsement would be necessary to complete negotiation, one who received the negotiable document without indorsement would be in all but technical legal title the owner of the goods, and could turn his equitable title to the goods into a legal title by compelling an indorsement of the document. * * *" 2 Williston on Sales, § 430, p 624.

See OCLA, § 60-243.

As we have said, there is no evidence of any agreement between transferor and transferee concerning the effect of the transfer by delivery of the warehouse receipt. Its delivery and acceptance certainly constituted at least substantial evidence of acceptance of the hops and transfer of title. For the reasons given

we conclude that the question of acceptance by Netter was properly submitted to the jury.

Defendant presents the second-ditch argument that Netter was not authorized to accept the hops on behalf of his principal. Netter affixed to Exhibit C the signature "Williams & Hart by Ernest Netter". Defendant in his brief says that "appellant, acting through Mr. Netter" secured the signature on Exhibit C. Netter testified that he had been employed by Williams and Hart for 10 or 11 years as a hop inspector. He said he had explained the purpose of Exhibit C to the plaintiffs, which testimony was flatly contradicted, thus presenting a jury question. He testified that he had no authority to accept or reject the hops.

The testimony of the defendant Williams is more candid and more revealing. We quote:

"Q In your employ at that time was Mr. Netter?
"A Yes.

"Q In what capacity was he employed?
"A An inspector and field representative, buyer, representing our firm in a particular district that the Pokornys and a number of other growers resided in."

Netter was asked if he had any instructions from his principal "with reference to the Pokorny bales." In an offer of proof which was made out of the presence of the jury and rejected by the court, Netter testified that Williams and Hart had instructed him "to get that [Exhibit C] signed in the case of Pokorny before the weighing took place." He said he was to weigh the hops only if they were willing that weighing wouldn't constitute delivery. Defendant Williams, on the contrary, testified that he gave no particular

instructions to Netter "with reference to the Pokorny crop". He continued:

"Q Do you know whether a form of any kind was supplied to Mr. Netter in connection with the Pokorny crop?

"A I could only answer that in a general way. Forms were given to all our field men with instructions that, as Mr. Netter testified previously, in order to shortcut work and save warehouse charges, that all crops that we had anything to do with were weighed—in other words were gone through in exactly the same manner that the Pokornys' were, and the waiver of acceptance signed by the individual grower to give us time to turn around and see if we couldn't market the hops.

"Q Did Mr. Netter have any authority to accept these hops on the part of Williams and Hart?

"A No. He did not, sir."

From the evidence we find that Netter was more than an inspector. He was a field representative of the firm in a district which included the Pokornys and a number of other growers. He was a "buyer."

The complaint alleged that the defendants accepted the hops, and the answer denied the allegation. There was no reference to agency in either pleading, and none was necessary. Proper evidence as to the actual authority of Netter, and opposing evidence as to his real or apparent authority, was received. Defendant makes no contention that such evidence is inadmissible under the pleadings.

■ We have held that circumstantial evidence is ordinarily competent to establish the fact or extent of an agency. *Bailey v. Opp*, 159 Or 301, 77 P2d 826, 80 P2d 40. The testimony of the defendant Williams is sufficient to show that Netter had actual authority

as representative and buyer to accept the hops within the district involved. This is not a case in which authority can be shown only by prior manifestations of the principal as to the transaction. His testimony at the trial establishes a general agency. 1 Restatement, Agency, § 3. We are concerned only with the contention that the agent received special and limiting instructions as to this particular sale as claimed by Netter, or that he received general limiting instructions requiring the use of Exhibit C in all purchases within his district, as claimed by the defendant.

All parties to the transaction knew that weighing and numbering the bales was the customary manner by which acceptance was manifested. If the testimony in behalf of the plaintiffs is to be accepted, as must be done, the plaintiffs had no knowledge of any requirement or purported agreement modifying the legal effect of weighing and numbering.

In *United States Nat. Bank v. Herron,* 73 Or 391, 144 P 661, this court held that special authority, *like a general one,* confers by implication all powers necessary for or incident to its proper execution.

As to third persons, a principal is bound by his agent's acts, not only when executed pursuant to actual authority, but also when within the scope of his apparent authority arising from the manner in which his principal has held him out to the public. *Portland v. American Surety Co.,* 79 Or 38, 153 P 786, 154 P 121. See also *Nicholas v. Title & Trust Co.,* 79 Or 226, 154 P 391; *Graef v. Bowles,* 119 Or 498, 248 P 1090; *Pacific Biscuit Co. v. Dugger,* 40 Or 302, 67 P 32. Netter had been held out as a representative and buyer of the defendant for many years.

■ Again, we have held that persons dealing with a known agent have a right to assume, in the absence of information to the contrary, that his agency is general. *Rae v. Heilig Theater Co.*, 94 Or 408, 185 P 909.

■ In *White v. Gordon*, 130 Or 139, 279 P 289, this court said:

> " * * * We are not concerned with any restrictions or limitations put upon her authority by the principal, of which the plaintiff had no notice: Thomas v. Smith-Wagoner Co., 114 Or 69 (234 Pac. 814)."

And see *Carstens Packing Co. v. Gross*, 131 Or 580, 283 P 20; *Fine v. Harney County Natl. Bank*, 181 Or 411, 170 P2d 365, 182 P2d 379. See also *Andrews v. Spencer*, 193 Or 615, 238 P2d 729, where the court discussed the binding effect of the exercise of apparent authority even where no agency existed. The court cited with approval 2 Am Jur, Agency, § 104, as follows:

> " ' * * * stating the rule as one of estoppel, where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority; he will not be permitted to prove that the agent's authority was, in fact, less extensive than that with which he apparently was clothed. This rule is based upon the principle that where one of two innocent parties must suffer from the wrongful act of another, the loss should fall upon the one who, by his conduct, created the circumstances which enabled the third party to perpetrate the wrong and cause the loss.' 2 Am Jur, Agency, § 104."

We conclude that the evidence presented a question for the jury as to whether the acts of Netter were binding upon the defendant.

■ In his motion for a directed verdict, the defendant contended that there was no substantial evidence that the hops were worth 78 cents "or any other sum." This point was not presented by the assignments of error in this court and it might properly be disregarded. However, the court has seen fit to give it brief consideration.

■ Clifton Pokorny testified that he had "been in hops" around 20 years and was acquainted with the price of hops each year. He knew what hops were being sold for in the neighborhood by the growers in 1947. He testified:

"Q Do you know what was the price of hops of the kind and quality you and your father and brothers produced in 1947?
"A Yes.

"Q What were they?
"A Seventy-eight cents a. pound."

He stated that the average leaf and stem contents for the year 1947 was 12 per cent; that hops having 12 per cent or less had a value of 83 cents. He testified:

"Q How did you fix this value at seventy-eight cents?
"A They take one percent, over twelve percent they take one cent off the price which runs it backwards. Taking five cents from eighty-three leaves seventy-eight.

"Q When did you learn that that kind of computation is made?
"A According to the way hops were sold that year.

"Q Did you know that in 1947?

"A That was the way it was rated."

Defendant's witness Eismann, who was manager in Oregon and Idaho for S. S. Steiner, Inc., hop buyers, testified:

"Q * * * there was testimony in this case, Mr. Eismann, this morning, that hops up to twelve percent had a market price of eighty-three cents, and that hops above twelve percent leaf and stem content had a market price equal to one cent reduction for each percentage over twelve percent. I would like to have you tell the jury whether in your opinion that is a correct statement as to hops of over twelve percent.

"A No, that wouldn't be my opinion of a correct statement. As generally practiced by the trade at that time, all contracts and purchases that were made had a limit of eight percent leaf and stem. In our own case I know we would take them up to ten percent with a one cent reduction for each percentage. Above ten, we preferred not to take any, but if we did we took them at a more substantial reduction than one cent.

\* \* \* \* \*

"Q To get down to this question more thoroughly, I will ask you what is usual in the trade when they go in and take samples from a bale and then go back and take the hops in, weigh the hops, whose hops are those after that, the grower's or the dealer's?

"A It is generally considered when they are weighed by the dealer that they are his hops.

"Q When the warehouse receipt is given to the dealer then what; that is, when they are weighed and the receipt given?

"A If they are weighed and the warehouse receipt is given it would be my opinion they are the dealer's hops."

Witness Lenners testified for plaintiff as follows:

"Q  Now then, Mr. Lenners, do you recall what was done with hops with a leaf content over twelve percent?

"A  That I do not know.  It was a bad year. There was supposed to be a shortage of hops that year earlier in the season, but it developed into a big crop, then we got a light rain and the mildew struck.  I know what happened to some of them, but as to the percentage—unless they had an agreement or if the contract stated so much above eight percent, that was so much less; if it runs up to seventeen percent, it was less, but if it was more than that the grower lost money.

"Q  Do you know what percent they took off?

"A  I think it was one percent, I believe, or two.

"Q  You don't know, though?

"A  I don't know exactly, it was either one or two cents anyway."

An interesting calculation will demonstrate with mathematical certainty the basis of the verdict.  The weight slip furnished to plaintiffs by Netter showed gross weight 3,703 pounds, less 95 pounds "tare", or a net weight of 3,608 pounds.  Clifton Pokorny had testified to a market price of 83 cents with a penny reduction for each percentage of leaf and stem content over 12 per cent.  Leaf and stem content was calculated at 17 per cent.  Plaintiffs' prayer was for 3,608 pounds at 83 cents less 5 cents per pound because of excessive leaf and stem content, or a total of $2,914.24.  The jury must have accepted the evidence that there was 17 per cent leaf and stem content but concluded that 2 cents per pound reduction was proper instead of one cent as testified to by the plaintiff.  The leaf and stem content was 5 per cent above the 12 per cent testified to by plaintiff.  Eighty-three cents a pound reduced by 2 cents per pound for each percent-

age over 12 (namely 5) would call for a reduction of 10 cents per pound. The poundage of 3,608, multiplied by 73 cents per pound, is $2,633.84, the exact amount of the verdict. While the plaintiffs' evidence might not convince this court if we were trying the case de novo, we cannot say that there was no substantial evidence to support the verdict on the issue of value.

## SECOND ASSIGNMENT OF ERROR

Lastly it is contended that the court erred in sustaining the plaintiffs' objection to the testimony of Ernest Netter relating to the limitation of his authority with respect to acceptance of the hops. We have already summarized the testimony of Netter which was given out of the presence of the jury by way of an offer of proof, and which was rejected by the court. The defendant correctly states the general rule to the effect that

> " * * * Plaintiffs suggest that the authority of an agent may not be proved by his own testimony. This is a common misconception. The authority of an agent may not be proved by his mere extrajudicial declarations, but his testimony as to his agency and the extent thereof is competent. * * * " *Holt et ux. v. City of Salem et al,* 192 Or 200, 210, 234 P2d 564.

*Ramsey v. Wellington Co.,* 114 Or 355, 235 P 297; *Du Bois-Matlack Lbr. Co. v. Davis Lbr. Co.,* 149 Or 571, 42 P2d 152; 3 CJS, Agency, § 322 (b), p 275.

As of the time that the offer of proof was made, the testimony was relevant and should have been admitted. However, counsel for defendant wisely said, concerning this ruling, "Perhaps defendant was not prejudiced."

It is our present duty to consider the effect of the exclusion of this evidence in the light of the verdict. The principal issue in the case was the acceptance or rejection of the hops. This issue was submitted for determination by the jury. The jury could not have returned a verdict for the plaintiffs without finding on the disputed evidence that plaintiffs were not advised of the alleged limitation of Netter's apparent authority, and that plaintiffs did not agree by Exhibit C or otherwise that Netter's acts performed in conformity with customary practice should be construed contrary to the customary conclusion that title passed thereby. The verdict must be construed as determinative of those issues in favor of plaintiffs. In view of this determination, it becomes immaterial, so far as the result is concerned, whether or not Netter received uncommunicated limitations on his apparent authority. The offered testimony of Netter was in fact less favorable to the defendant than the evidence of Williams on the same issue which was received. We hold that the error was not prejudicial and the judgment is affirmed on all points.