Argued February 4, affirmed as modified and remanded
May 30, 1975

TRANSPACIFIC LEASING, INC., *Respondent,
Cross-Appellant, v.* KLINELINE SAND &
GRAVEL CO., ET AL, *Appellants, Cross-
Respondents.*
535 P2d 1360

*Jonathan A. Ater,* of Lindsay, Nahstoll, Hart, Dun-

can, Dafoe & Krause, Portland, argued the cause and filed the briefs for appellants, cross-respondents.

*Ridgway K. Foley, Jr.,* Portland, argued the cause for respondent, cross-appellant. With him on the brief were Kenneth E. Roberts, and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before McAllister, Presiding Justice, and Holman, Howell, Bryson, and Schwab, Justices.

HOLMAN, J.

This is an action for damages for the breach of a contract for the lease of a concrete base stabilization plant (pugmill). Defendant Klineline Sand & Gravel Co. (Klineline) needed a pugmill to complete a contract by which it was obligated to furnish concrete base for a highway project. Klineline had intended to purchase the pugmill from the Schetky Equipment Corporation; however, since Klineline needed financing, Schetky Equipment sold the pugmill to plaintiff, Transpacific Leasing, Inc. (Transpacific), which, in turn, leased it back to Klineline. When Klineline defaulted upon the lease, the pugmill was repossessed and this action was brought by Transpacific for damages.

Defendant Fuhrman, the president of Klineline, was joined in his personal capacity as a party defendant. Plaintiff claims that Fuhrman signed the lease as a co-lessee for the purpose of guaranteeing its performance and is therefore jointly and severally liable along with Klineline. Fuhrman denies this and claims that he signed to guarantee only the first $60,000 to be paid upon the contract and that at the time of default more than this amount had been paid. A judgment was entered pursuant to a jury verdict in favor of Transpacific and against Klineline and Fuhrman in the sum of $37,816.77 plus interest and attorney's fees. Both defendants appeal, and plaintiff, contending the damages were insufficient, cross-appeals.

The first issue we will consider is that of damages. Defendants contend there was insufficient evidence of damages and a non-suit and directed verdict should have been granted. Plaintiff claims that an insufficient amount of damages was submitted to the jury for its consideration. The contract went into effect the latter part of December 1970 and was for a period of 60 months, but provided for only 45 monthly payments of $3,643.20, no payment being due in the months of November, December, and January of each year commencing November 1971. The original value of the plant was specified to be $118,800. After the contract had run 22 months, a default was declared and the plant was repossessed and subsequently sold by Transpacific for $45,000. The contract provided as follows:

"* * * * *.

"16. *In the event of default hereunder by the Lessee, the Lessor,* in addition to all other remedies provided by law, *shall have the right to take possession of the equipment* leased hereunder and may enter upon the premises of the Lessee for that purpose, *and at its option may sell the equipment* or any portion thereof or lease the same for the remainder of the term hereof and should the net rental obtained therefrom be less than that provided herein, the Lessee shall be liable for payment of the deficiency to the Lessor, *and in the event of sale, the Lessee also shall be liable for payment to the Lessor of any deficiency between the net proceeds of such sale and the then depreciated value as computed pursuant to 'Exhibit A.'* Nothing in this paragraph contained shall be construed as releasing the Lessee from the obligation to pay the rent herein provided, or to release the Lessee from such other obligations and duties as might be lawfully imposed." (Emphasis added.)

"Exhibit A" attached to the lease contained no means of computation for determining the depreciated value

as paragraph 16 of the body of the lease indicates it did.

■ The notice of default given by Transpacific to defendants stated:

"*In accordance with paragraph 16* of the lease dated December 22, 1970, between Trans Pacific Leasing, Inc. and Klineline Sand and Gravel Company, Inc. and Rolph B. Fuhrman, *Trans Pacific intends to take possession of the equipment leased hereunder and proceed to sell it in order to determine a deficiency as provided under the lease.*

"By copy of this letter, I am instructing Schetky Equipment Corporation to remove the Base Stabilization Plant and Portable Cement Silo as described in the Lease Schedule from the premises of Klineline Sand and Gravel Inc. and to proceed to sell it or any portion of it. Concurrently, *I am instructing our attorneys to initiate steps as provided in the lease to recover unpaid rentals, past and future.*" (Emphasis added.)

Despite the statement in the notice that Transpacific intended to collect unpaid future rentals, it is clear that the pugmill was being repossessed and sold under the provisions of paragraph 16 of the contract. As a result, Transpacific is bound by the measure of damages specified therein in the event of such repossession and sale under that paragraph.

■ Other than those in paragraph 16, there are no other contract provisions which provide for damages in case of default. The meaning of the last sentence of paragraph 16, which states that the paragraph shall not be construed as releasing the lessee from the duty to pay rent is ambiguous in view of the forepart of the paragraph which provides for the measure of damages in the event of repossession and resale. Under such circumstances the last sentence will be construed against the drawer of the contract, Transpacific. Cer-

tainly, it was not intended that plaintiff be entitled to repossess and resell the pugmill, to secure the difference between its depreciated value and the resale price, and to recover payments on the terminated contract as well. The last sentence of the paragraph is therefore construed, where repossession and resale are chosen, as providing that defendants have the duty to continue making only those payments which were due *prior* to the time of repossession.

■ As indicated, Exhibit A does not specify the method of depreciation to be used. However, this is not fatal to a computation of the depreciated value. When a contract specifies depreciated value as the base for figuring damages in case of default but does not indicate the method of depreciation that is to be applied, the proper method is that which is usually used. The evidence indicates that although there are various methods of depreciation, straight line method is usually employed, *i.e.,* a proportionate amount of the cost less any residual value is written off each month over the economic or contract life of the equipment. The testimony of plaintiff's witness revealed that depreciation was so set up on plaintiff's records, but the witness claimed that this was for tax purposes only.

It is our conclusion that there was no issue on damages to be submitted to the jury except that which concerned the propriety of the $45,000 resale price of the pugmill after repossession. This latter issue was contested by defendants and was submitted to the jury which rendered its verdict in favor of plaintiff. Klineline's default as of October 31, 1972, is uncontested, and an election by Transpacific having been made under paragraph 16 to repossess and resell the pugmill, the court should have computed the damages as provided by the contract.

The contract contemplates a 10 per cent residual value at the completion of the lease, or $11,800. The

balance of 90 per cent, or $106,920, was to be depreciated over the 60 months' term of the lease. Straight line depreciation on this amount over a 60-month period would be $1,782 per month. At the time of default 22 months had passed. Depreciated value of the plant as of the date of default, October 31, 1972, was:

| | |
|---|---|
| Initial cost | $ 118,800.00 |
| Less accrued depreciation ($1,782 x 22) | 39,204.00 |
| Depreciated value | $ 79,596.00 |

At the time Transpacific declared the default, two months' rent was owing. In March of 1973, long after default, Schetky Machinery paid a sum equal to three months' rent to Transpacific because Schetky Machinery had also guaranteed Klineline's obligation under the contract. Transpacific was entitled to apply only two-thirds of the sum, or two months' rent, to payments owing prior to its declaration of default and notice of repossession since Klineline was only two months in arrears at the time notice was given. The balance, $3,643.20, must be applied to Transpacific's damages. Damages under the contract are computed as follows:

| | |
|---|---|
| Depreciated value | $ 79,596.00 |
| Less sales price | 45,000.00 |
| | 34,596.00 |
| Less amount received March 31, 1973 | 3,643.20 |
| Total actual damages | $ 30,952.80 |

The next question to be decided is whether defendant Fuhrman is personally responsible for the judgment. He contends he was entitled to a directed verdict.

At the threshold there is a dispute between the parties which concerns the role of Mr. Schetky of Schetky Equipment Corporation. He was the intermediary who negotiated the contract between Trans-

pacific and Klineline. Though Fuhrman contends Schetky was the agent of Transpacific and assigns as error the trial court's ruling to the contrary, it is our conclusion that there is no evidence that Mr. Schetky was the agent of either Transpacific or Klineline. He was representing the interest of Schetky Equipment Corporation, the seller of the equipment, and no one else.

The lease was signed for Klineline by its general manager, Mr. Jordan. Fuhrman testified that when he subsequently returned to work from a Christmas vacation on December 28, Schetky called him and told him that Transpacific was requiring Fuhrman's personal guarantee of the lease. Fuhrman stated that he and Schetky discussed this issue and finally agreed that Fuhrman would guarantee the first $60,000 paid upon the contract. Thereafter, Schetky brought the contract to Fuhrman at his office and obtained his signature. On its face the contract provided that Fuhrman was a co-lessee but it contained no provision which indicated that he was to be responsible for only the first $60,000 of payments.

Fuhrman testified that at the same time Schetky also gave him a letter signed by Schetky dated December 28. The contents of the letter were to the effect that Fuhrman's responsibility as guarantor was limited to $60,000. Although the letter was offered in evidence it was not received because there was no showing that Schetky was authorized to make the concession on behalf of Transpacific.

Fuhrman also testified that concurrent with the signing of the agreement he executed a letter dated December 29 and addressed to Mr. Gray, who represented Transpacific, in which he stated that he was responsible for only the first $60,000 of payments, and that he was "90 per cent sure" that at the time he

signed the contract he gave the letter to Schetky for delivery to Gray.

Schetky testified that the contract was drawn by Transpacific and was given to him by Mr. Gray to secure the signatures of Klineline and Fuhrman. Jordan signed for Klineline and Fuhrman later signed in his personal capacity. He testified also that Gray required Fuhrman's signature because Transpacific was advancing more than the price of the plant. The price of the pugmill was approximately $58,000, but Schetky said Klineline wanted Transpacific to finance an additional $60,000 to pay the cost of installing the plant. Schetky testified that before Transpacific would finance this amount it required Fuhrman's signature guaranteeing the whole contract since the plant was not adequate security for the total amount. He further stated that when Fuhrman signed the lease Fuhrman said he thought he was supposed to be responsible for only $60,000, instead of the entire amount as provided by the lease, but that he, Schetky, then told Fuhrman that Gray would not go along with any limitation on Fuhrman's liability. At this point in the trial, Schetky's letter to Fuhrman, stating that Fuhrman was responsible for only the first $60,000 of payments on the contract, was offered for the second time and its admission was again refused.

Schetky said he had no memory of the date he called upon Fuhrman but assumed it was December 31 because Exhibit A to the lease had on it both that date and Fuhrman's signature. He did not testify as to whether any letter was given to him by Fuhrman at the time he received the signed lease from him or whether or not he, Schetky, delivered such a letter to Gray.

It is interesting to note that Fuhrman testified that Klineline paid the cost of installing the plant and that Schetky kept the extra $60,000 over and above the

cost of the plant. Schetky admitted he received the entire sum on December 31 and applied $60,000 of it on a pre-existing indebtedness of like amount owed Schetky Equipment by Klineline. Gray testified he did not know that the price of the plant was only $58,000 and he was not aware Transpacific was advancing $60,000 in excess of its price.

Gray testified he talked only to Schetky and had delivered the contract to Schetky to secure Klineline's and Fuhrman's signatures. He said that he did not sign the contract for Transpacific until after both Klineline and Fuhrman had signed. On December 29, the date testified to by Fuhrman as being the date he signed the lease as well as the date of the letter limiting his liability, Gray wrote a letter to Fuhrman enclosing Klineline's and Fuhrman's copy of the lease. In order for this to have taken place, the original contract must already have been signed by both Klineline and Fuhrman.

On January 5 Gray again wrote to Fuhrman, answering Fuhrman's letter of December 29 in which Fuhrman limited the amount of his liability under the contract, stating that the transaction had been approved by Transpacific upon the basis of Fuhrman's guarantee of the entire amount; that Schetky had proposed a $60,000 limit on Fuhrman's personal responsibility, but that such a limitation had not been approved. On January 12 Fuhrman wrote back, stating that there was some misunderstanding, and requested that a meeting of Gray, Schetky and himself be arranged. However, the parties never resolved this issue. It should be remembered that Klineline was responsible on the lease in any event and this obligation furnished adequate consideration for the advancement thereafter of the money to Schetky Equipment by Transpacific.

It is Fuhrman's contention that there was no meeting of the minds between himself and Gray upon a specific contract. He argues that the signed lease which was tendered back to Gray with the letter limiting Fuhrman's personal liability was a rejection of Transpacific's offer tendered by the written lease, and that it constituted a counteroffer for a lease with a limitation upon Fuhrman's personal liability. He contends that Gray could not thereafter sign the lease and bind Fuhrman to terms to which he did not agree.

■ If Fuhrman's letter of December 29 was delivered to Gray together with the signed lease, Gray had no right to rely on the provisions of the signed contract. His acceptance of the lease on behalf of Transpacific would have operated as an acceptance of Fuhrman's counteroffer, and Fuhrman's liability would have been limited to the first $60,000 paid upon the contract. In such an event, there can be no recovery against Fuhrman because more than $60,000 was paid upon the contract.

■ If, on the other hand, the contract was signed by Gray and the money disbursed to Schetky before the Fuhrman letter was received by Gray, the question exists whether a contract came into existence between Fuhrman and Transpacific. It does not necessarily follow that if Gray was unaware of Fuhrman's intent to limit his liability when he signed the contract, a contract for full liability on Fuhrman's part was consummated. The tender back of a signed lease together with a qualifying letter would be a counteroffer. *Small v. Paulson,* 187 Or 76, 85, 209 P2d 779 (1949). If the letter was not simultaneously delivered with the lease, and if such non-delivery was not knowingly or negligently participated in by Fuhrman, despite the objective theory of contracts,[1] the better rule seems to

_____

[1] See Pokorny v. Williams, 199 Or 17, 35-36, 260 P2d 490 (1953) for a discussion of the objective theory of contracts.

be that there there is no meeting of the minds sufficient to form a contract. See 1 Corbin on Contracts §§ 106-07 (1963). However, if one party has knowingly or negligently misled the other party, he cannot escape responsibility by proving his own subjective intent. Corbin, *supra*.

■ In the present case, if Fuhrman gave the letter to Schetky·together with the lease for delivery to Gray, there would be no basis for a finding that there was a contract binding Fuhrman for the full amount unless there is evidence from which a jury could find that Fuhrman knowingly or negligently misled Gray into signing the contract and paying the money to Schetky. The mere fact that the limitation of liability was in a separate letter rather than on the contract as a notation is an insufficient reason for saying Fuhrman was negligent. It is an acceptable way to make a counter-offer.

■ We conclude that a jury question exists on the issue of whether Fuhrman had reason to believe that the intention expressed in his letter would not be communicated to Gray together with the lease. Gray testified that he had no knowledge that the price of the pugmill was only $58,000 instead of $118,000, and that the extra $60,000 was being used to pay Klineline's account with Schetky Equipment Corporation; and that had he known it, he would not have made the deal because he had no authority to do so. Obviously, both Schetky and Fuhrman had to have had such knowledge, and if what Gray testified to is true, it would appear that Fuhrman and Schetky were in league to cover up the actual terms of the deal. There was evidence from which it could be found that the only way this transaction could be completed was for Fuhrman to appear to guarantee the entire amount. Obviously, both Schetky and Fuhrman had a great interest in having the transaction completed. Schetky got his account

paid and Klineline received an opportunity to pay off the amount of the account over a period of five years. Under such circumstances, we would be uneasy in holding that a factfinder would have to conclude that Fuhrman gave the letter in good faith to Schetky with the belief that it would be delivered to Gray with the lease.

We realize that Gray did not deny that he had received the letter with the signed lease and that Schetky was not recalled as a witness by Transpacific to testify as to whether he was given the letter and, if so, what he did with it. Despite the uncontradicted testimony of Fuhrman that he was "90 per cent sure" that he gave the letter and the lease to Schetky for delivery to Gray, we believe the personal interest of Schetky and Fuhrman in having the deal completed was sufficient to make a jury question concerning the course of events which took place in the delivery of the letter to Gray, and the intent and knowledge with which it was dispatched. See *Rickard v. Ellis,* 230 Or 46, 368 P2d 396 (1962) for a discourse upon when the uncontradicted evidence of a witness must be accepted at face value.

Defendant Fuhrman also contends that the court erred when it refused to receive in evidence Schetky's letter of December 28 addressed to Fuhrman which purported to limit Fuhrman's liability to the first $60,000 paid on the contract. We find that the court's original ruling was correct because there was no evidence that Schetky was Transpacific's agent for the purpose of limiting Fuhrman's personal responsibility and there was a timely objection to its admissibility on that basis. However, after Schetky testified that he had told Fuhrman that Gray had refused to qualify Fuhrman's personal responsibility on the contract, the letter was again offered in evidence and at that time it was receivable in evidence since it could be construed as being inconsistent with Schetky's testi-

mony. However, we do not believe that the trial court committed reversible error in excluding the letter since defendants' attorney did not call to the court's attention that the evidence was now being submitted on a different basis than that on which it had previously been offered. In addition, Fuhrman was allowed to testify concerning the contents of the letter. Under such circumstances we do not believe that it would be fair to grant a reversal.

■ Defendant Fuhrman contends the trial court erred in its instructions to the jury concerning the issue of Fuhrman's personal responsibility upon the lease. The only exception taken to the instruction was that there was insufficient evidence to go to the jury on that issue. We have previously held that there was sufficient evidence. No other errors were called to the trial court's attention and, therefore, we do not consider other reasons advanced by Fuhrman for its defectiveness.

■ Fuhrman also contends the trial court erred in failing to give certain requested instructions. Without their being set forth verbatim, the instructions generally involve:

1. A contract depends upon the intention of the parties and to determine such intent consideration must be given to the conduct of the parties in the light of the then existing circumstances;

2. In deciding whether there is or is not a contract, the jury must consider all the words and documents between the parties;

3. In order for there to be a contract, the parties must have agreed to the same terms and conditions, in other words, there must be a meeting of the minds;

4. Neither party may assume that a contract exists if he knows that the other party does not intend that which his words or actions seem to express.

A perusal of the requested instructions reveals in some respects they duplicate each other and in some instances they merely state the obvious. It is our conclusion that the requested instructions were either covered by the instructions which the court did give or, in the respects in which they were not covered, no prejudice existed.

The only material respect in which the instructions were defective was in their failure to recognize the possibility that there could have been a failure in communications between Fuhrman and Gray caused by Schetky for which neither Fuhrman nor Gray was responsible, and which would have resulted in no meeting of the minds. No exception was taken on this basis.

The amount of the judgment against both defendants will be reduced to the sum of $30,952.80, and in all other respects the judgment of the trial court is affirmed. The matter is remanded to the trial court for an entry of a judgment in conformance with this opinion. Costs are awarded to defendants.