Argued June 3; affirmed June 30; rehearing denied
September 10, 1936

# ALEXANDER *v.* ALEXANDER
### (58 P. (2d) 1265)

*Benjamin B. Goodman* and *Clifford D. O'Brien,* both of Portland (Benjamin B. Goodman and Kenin & O'Brien, all of Portland, on the brief), for appellant.

*George Neuner,* of Portland (Neuner & Kimmell, of Portland, on the brief), for respondent.

BAILEY, J. The plaintiff, George Arnold Alexander, instituted this suit against the defendant, Alevia Alexander, his wife, for specific performance by the defendant of the terms of a certain instrument signed by both the plaintiff and the defendant, which, omitting the signatures of the parties, the jurat and the signatures of witnesses, is as follows:

"Joint Property Agreement by and between George Arnold Alexander, and Alevia Alexander, husband and wife, of the city of Portland, Multnomah county and state of Oregon.

"It is hereby understood and agreed by and between the above named parties, that all property, real and personal of whatsoever description or nature, all income from whatever source, wheresoever situated, acquired during the marital state of the parties hereto, shall be and is the joint in entirety and community property in undivided moieties and is and shall be subject only to the joint control and disposition of the parties hereto; and shall at all times be carried in their joint names in accord herewith, except as hereinafter provided:

"That all deeds, notes, mortgages, certificates of stock, bonds, fire insurance policies, bank deposits, and all evidences of ownership shall be legally transferred to conform to the terms of this agreement within ten days from the date hereof;

"That all policies of insurance, life, accident or otherwise, shall name as beneficiary therein the other party to this agreement than the insured;

"That this agreement cancels all agreements or wills relating to the disposition of such joint property acquired during the marital state, entered into or executed prior to this agreement;

"It is, however, understood and agreed that any property acquired through relatives of either party hereto, shall, after deducting loans therefrom, remain the sole property of such party to this agreement.

"It is further understood and agreed that each of the parties hereto shall draw the sum of twenty-five dollars per month for clothing and personal expenses; and that approximately one hundred seventy-five dollars shall be deducted from said incomes annually for payment of installment on Teachers' Retirement Fund; and that the remainder shall be deposited in their joint names for the purposes, 1st., the expenses of the home, including provisions, fuel, repairs, improvement, medical services, automobile, recreation, together with interest and principal on note and mortgages on other property; 2nd., the balance shall be deposited in joint saving account for such emergency as may arise, purchase of automobile when necessary, and investment.

"That within ten days from the date hereof, a joint agreement shall be entered into by and between the parties hereto relating to the disposition of said joint property, in the event of the death of one, and in the event of the death of both of the parties hereto.

"In Witness Whereof the parties hereto have voluntarily affixed their hands and seals this 11th day of September, A. D. 1933."

From a decree dismissing the suit the plaintiff appeals.

The second amended complaint, on which the suit was tried, alleges that the plaintiff and the defendant were then and for a period of 32 years prior thereto had been husband and wife, and that many years prior to the execution of the document hereinabove set out the plaintiff and the defendant had reached a "mutual oral agreement and understanding that all savings and

accumulations whatsoever, acquired by the parties or either of them, during the marital status, should be regarded as the joint, mutual and community property of both of them''; that since the said oral agreement and understanding, and as a result of their mutual earnings and savings the plaintiff and the defendant had accumulated divers parcels of real property, description of which is contained in inventory attached as exhibit to the pleadings; and that they had also accumulated personal property "consisting of moneys, stocks, bonds, notes and mortgages and other divers securities, life, fire and accident insurance policies," which are likewise listed in an exhibit attached to the pleadings. It is then alleged that the plaintiff, relying upon such oral understanding, had, at the defendant's request, permitted title to real property purchased with their mutual earnings and savings to be taken in the name of the defendant, and had also permitted defendant to purchase with their mutual savings stocks, bonds, notes, mortgages and other securities.

Plaintiff further avers that the defendant, without the knowledge and consent of plaintiff, had depleted the mutual savings and accumulations of the parties by making loans and gifts to her relatives and by ill-advised business transactions in the purchase and sale of securities; and that she had continuously violated in other ways the said oral understanding and agreement between the parties. As partial performance of the oral agreement it is alleged that defendant caused plaintiff's name to be added to a checking account that she had theretofore established in her individual name in a bank in the city of Portland, and that she also caused a certain tract of land purchased in Portland to be taken in the joint names of herself and plaintiff.

It is then set forth that on September 1, 1933, the plaintiff advised the defendant "that he could not further bear the discord, disputes, aggravations, quarrels and contentions resulting from the defendant's constant violation of the said oral agreement and that their domestic discord had undermined his health, and that by reason of all thereof he proposed to file a suit and apply therein for a division of their mutual savings and accumulations; and that the defendant shortly thereafter, in order to prevent the plaintiff from filing a suit for divorce, and for the purpose of settling their differences theretofore existing, promised and agreed to enter into a written agreement with plaintiff express-ing among other things the terms and conditions under which the savings and accumulations acquired by either or both of the parties during their coverture should be held and/or disposed of, and in conformity therewith the parties did, on the 11th day of September, 1933", enter into the agreement hereinbefore quoted. Certain facts are then alleged to the effect that the terms of the written agreement were partially performed. As acts of partial performance are mentioned the fact that the defendant placed the plaintiff in charge of a five-acre walnut orchard standing in her name, that she caused certain stock in the Hawley Pulp & Paper Company "to be escrowed" in their joint names, and that she made available to plaintiff the safety deposit box maintained in her name and permitted him to make inventory of the securities which she had placed in it. The making of the oral agreement and partial performance of the oral and written agreements by the defendant are denied in her answer.

In the trial of the case the circuit court permitted wide latitude in the introduction of testimony as to

practically everything which must have occurred in the business affairs, and to a limited extent the private life, of the litigants since their marriage in Wisconsin in 1902. We shall not attempt to give a summary of all that testimony.

■ The defendant began teaching school in Wisconsin in 1891. The plaintiff entered into the practice of law in the same state in 1900. In 1902 t he parties were married and established their home at Manitowoc, Wisconsin, where for two years thereafter the defendant continued to teach school and the plaintiff to maintain a law office. The fact is uncontroverted that the defendant had accumulated at least $500 before her marriage, which she kept in a separate account after marriage.

The parties moved to Fond du Lac in 1904, when the plaintiff accepted a position as clerk in his father's hotel. The defendant gave up teaching and worked about the hotel, taking care of the linen and rendering other services. For such work the parties received their room and board, and $50 a month was paid to the plaintiff, part of which he turned over to the defendant. The plaintiff asserts that he received additional revenue from an outside venture with his brother, and that the amount of this revenue, together with the $50 paid by his father, averaged about $75 a month for the three years spent at Fond du Lac.

After this interval the couple went to Idaho, where apparently some marital trouble arose. The plaintiff then went to Spokane, Washington, and obtained work in a hotel and restaurant, and the defendant remained in Idaho, where she taught for one year.

In 1908 the plaintiff came to Portland, and at his suggestion after the close of defendant's term of school

in Idaho she joined him and they resumed living together. Shortly after arriving in Portland defendant applied for a position as a public school teacher and in her application for employment stated that although married she was largely dependent upon her own efforts for her support. She was employed as a teacher in the fall of 1908 and has continuously served in the Portland schools since that time, either as a teacher or a principal. Her annual salary as principal for a number of years was as high as $3,600. The plaintiff after coming to Portland worked at odd jobs, until 1919, principally as clerk in hotels or as a traveling salesman.

He purchased the lease and furniture of the Ansonia hotel in Portland in 1919, for $7,500. The money was borrowed by the defendant from a Portland bank on her note, secured by collateral, and the plaintiff gave her his note for the amount so borrowed by her. This venture appears to have been fairly successful and the plaintiff repaid the defendant the amount borrowed by her. In addition to that sum he claims to have made a profit during the 11 months he operated the hotel, of some $1,500, and $3,000 on the resale of lease and furniture to the previous owner from whom he had purchased.

The plaintiff next bought the furniture and lease of the St. Paul hotel in Portland, for which a considerable part of the necessary funds was advanced by defendant and repaid to her by plaintiff. He conducted this hotel for five years and one month, when his increasing loss in operating became so great that he gave up the hotel, removed therefrom the furniture, which he valued at about $7,000, and for a year conducted a small second-hand store to dispose of this furniture. At the end of one year about half the furni-

ture remained unsold and the plaintiff traded it for some property at Toledo, Oregon, consisting of a duplex house and a single residence, against which there were encumbrances in excess of $3,300, payable in monthly installments. The title of this property was taken in the name of the defendant. It is claimed by the plaintiff that his profits on the St. Paul hotel were approximately $16,000, exclusive of the value of the furniture which he removed. This statement, however, is not supported by any books of account or documents of any nature.

About the year 1927 the plaintiff undertook to finance Mrs. Heylman, the stepdaughter of an aunt of the defendant, in certain mining litigation in which she was involved. According to his testimony, he advanced for that purpose approximately $7,500. After his own funds were exhausted he borrowed $250 from the defendant, giving his note therefor, which has never been paid. The advances made by him to Mrs. Heylman or on her behalf were made on the contingency that if she were successful he should receive from her twice the amount advanced. But since she was not successful in the litigation the money thus supplied by plaintiff was not repaid and the venture was a complete loss to him.

In 1926 Mrs. Alexander purchased a residence in the Waconda addition to Portland, paying $1,000 cash and assuming, and later paying, a $3,500 mortgage. This property was taken in her own name. Both the plaintiff and the defendant moved into this residence and lived in it from about 1927 until the summer or fall of 1934, when Mrs. Alexander moved from the place, leaving the plaintiff in possession. About the same time that the Waconda addition property was purchased,

the defendant negotiated the trade of a lot which stood in her name in Laurelhurst addition for a residence in the Westmoreland section valued at approximately $7,500. She paid the difference between the value of the lot and the cost of this second residence. The title to the latter property was taken in the names of both the plaintiff and the defendant. The plaintiff claims that this was in recognition of their oral agreement made in 1904, to the effect that all their earnings should be the joint property of both. The defendant, however, asserts that the plaintiff had complained so much because the Toledo property was taken in her name that she caused this residence to be taken in both their names to appease him.

After the plaintiff closed his second-hand furniture store in 1926 or 1927 he appears to have had little employment. He contends that he was kept busy doing the housework in their home in Waconda addition while defendant was teaching. From time to time the defendant would give plaintiff money to meet household needs and for his personal use, until he complained so much about the arrangement that she put her checking account in their joint names to spare him any humiliation in asking her directly for any money he might need.

It appears from the record that during the time that the defendant was occupied with the operation of the Ansonia and St. Paul hotels he and the defendant had few disagreements. The operation of the hotels was under the direction of plaintiff himself and the profits therefrom were kept separate and apart from the money which the defendant received as salary for teaching. After the St. Paul hotel was disposed of and the second-hand store was discontinued the plaintiff became irritable and was continually nagging the de-

fendant about financial matters and especially about money which she had loaned or given to her relatives.

In the latter part of August, 1933, the plaintiff approached the defendant about a property settlement. According to his story, he reminded her of their oral agreement made in 1904, whereby, according to his contention, it had been agreed that their separate earnings should become the joint property of both. He testified that after some discussion the defendant consented that this oral agreement be reduced to writing and he thereupon prepared a written agreement which he exhibited to her, but she objected to it. This tentative agreement is an exhibit in the case. The first part of it is almost identical with the agreement hereinabove set out. The part that defendant objected to, according to plaintiff's testimony, was that each of the parties should have a right to draw $20 per month for clothing and personal expenses, instead of $25 as in the final agreement, and the last clause of the tentative agreement, which provided that upon the death of the plaintiff before that of the defendant the latter should pay $1,000 each to a brother and a sister of the plaintiff, and that upon the death of both plaintiff and defendant the joint property of both should be divided in the ratio of two-fifths to the brother and sister of plaintiff and three-fifths to the heirs of the defendant. Thereupon the agreement hereinabove set forth was, according to plaintiff, drawn up by him and presented to the defendant. After she had retained this instrument for several days the parties went to the office of plaintiff's attorney and executed it.

The defendant testified that she never saw the tentative agreement drawn up by the plaintiff and introduced in evidence, but she did see a tentative

agreement which provided for gifts of $1,000 each to his brother and sister upon his death. She objected to any such provision. She further testified that she did not see the typewritten agreement hereinabove copied, until she arrived at the office of plaintiff's attorney; that the plaintiff had represented to her all along that he wanted her to make provision for him in case of her death; and that she had agreed with him that one-half of her property should go to him at her death, and was advised by him that the agreement which she eventually signed was for that purpose only. While in the attorney's office she briefly scanned the instrument which she signed and noted that there was no provision for payments to the brother and sister of the plaintiff upon the latter's death, she testified, and she relied upon the plaintiff's statement that the agreement was merely to assure him one-half of her property in the event that he should survive her.

The basis on which the plaintiff seeks to uphold the written agreement of September 11, 1933, is that this instrument merely reduced to writing the alleged oral agreement entered into by the plaintiff and the defendant at Fond du Lac, Wisconsin, in 1904 after the plaintiff had taken a position as clerk in his father's hotel and the defendant had given up her work as a teacher, and that the said oral agreement during the succeeding years, according to plaintiff's testimony, had frequently been acknowledged and reaffirmed by the parties. This oral agreement, according to plaintiff, was founded upon the alleged statements by the defendant to the effect that, "What is yours is mine and what is mine is yours", and "What we have belongs to both of us". Language of similar import is said by the plaintiff to have been used many times by the defendant and acquiesced in by the plaintiff. Such an understand-

ing or agreement by the parties is emphatically denied by the defendant, and it is our opinion that the plaintiff did not prove, by a preponderance of the evidence, such an agreement, and that the actions of the parties negative the plaintiff's contention.

At the time of the marriage the defendant had an account of some $500 which she continued to maintain as a separate fund. The money which she earned teaching school was also kept in her individual account, and moneys earned by the plaintiff in doing hotel work, in employment as a salesman and at odd jobs, were to a large extent kept on his person and not considered as in any way belonging to the defendant. During the time that he was engaged in hotel operation in Portland the profits resulting therefrom were retained by him and not deposited in any joint account. He speculated disastrously on a lawsuit to the extent of some $7,000 or $7,500, without the advice or consent of the defendant. While he was conducting the hotels he provided lodging for the defendant and himself and whenever they took their meals out he generally paid for them. But during all their married life the defendant paid for practically all her own wearing apparel and during the years when plaintiff was not operating either hotel the defendant contributed more than half of their joint living expenses.

The record fails to sustain the plaintiff's contention that many, or indeed any, of the bonds and other securities in defendant's possession were paid for in part with the plaintiff's funds.

The real property standing in the defendant's name, as well as the personal property in her possession, is shown by the evidence to have been purchased with her separate funds and not with the joint earnings of the parties, with the exception of the Toledo property.

As to that property the evidence discloses that the plaintiff traded some second-hand furniture to the owner of the realty as part of the purchase price, but as to the value of the property the record is indefinite and uncertain and it would appear that the property was worth very little more than the amount of the encumbrances against it. The defendant testified that the Toledo property was taken in her name for the reason that the plaintiff did not have the means of keeping up the monthly payments of $43.90 on it for a period of five years and the payment of $24.75 monthly for an additional two and one-half years. However that may be, the placing of the title to the Westmoreland property in the joint names of plaintiff and defendant more than compensated the plaintiff for whatever interest he might have had in the Toledo property.

Although the plaintiff alleges that he is willing, ready and able to perform his part of the contract, our attention has not been directed to any testimony showing that he has in his name or in his possession any property which he could "legally transfer to conform to the terms of" the agreement. Furthermore, it can not be said, from the evidence, that by any act of the defendant she recognized the alleged oral agreement by partial performance thereof or that she partially performed the terms of the written agreement.

■ The written contract which is sought here to be enforced provides "that all property, real and personal, of whatever description or nature, all incomes from whatever source, wheresoever situated, acquired during the marital state of the parties hereto, shall be and *is the joint in entirety and community property in undivided moieties* and is and shall be subject only to the joint control and disposition of the parties hereto". We have had no assistance here as to what may be

meant by the part of the contract which we have italicized. The plaintiff testified that at the time he drew this contract, and he admits that it is his own product, he explained it to the defendant as follows: "There are some words in there that have stuck to me from 'way back in 1900. The word 'moieties', if you don't understand that we have a big dictionary there, but my understanding of it is that it is either a part or half of the interest." He further testified: "I explained the meaning * * * that the estate by entirety, as I understood it, in this state, was that each one owned an undivided half; neither one owned all of it, neither one owned more than half of it, and that at the death of either one the survivor took the whole and that it would save the probate of the estate in regard to that property; that the survivor took the whole." Mrs. Alexander testified that the plaintiff represented to her that by the terms of the contract he was to receive one-half of her property if he survived her.

It is difficult to say whether the language used by the plaintiff sought to make all the real and personal property the joint property of the parties to this litigation or intended to make them tenants by the entirety, or to have their possessions considered as community property, as that term is understood in states having community property laws, or what was intended by "undivided moieties".

Joint tenancy is abolished in this state: § 63-207, Oregon Code 1930; *In re Edwards Estate,* 140 Or. 431, 438 (14 P. (2d) 274). And it has further been held that there is no tenancy by the entirety in personal property in Oregon: *Stout v. Van Zante,* 109 Or. 430 (219 P. 804, 220 P. 414); and *In re Edwards Estate,* supra. If we were to hold that the language used by the plaintiff attempted to make the parties to the contract tenants

by the entirety, it would be difficult to explain the use of the words "in undivided moieties".

With reference to estates by the entirety, we find in 2 Thompson on Real Property, p. 939, § 1735, the following: "A conveyance or devise to two persons, who are husband and wife at the time the property vests in them, creates an estate by entireties. By reason of their legal unity by marriage, they together take the whole estate as one person. Neither has a separate estate or interest in the land, but each has the whole estate. Upon the death of one the entire estate and interest belongs to the other, not by virtue of survivorship, but by virtue of the title that vested under the original limitation. 'It is a sole and not a joint tenancy. *They have no moieties.* Each holds the entirety. They are one in law, and their estate one and indivisible.' " [Italics supplied.]

It is said in 1 Devlin on Real Estate (3d Ed.), p. 174, § 117: "At common law, where an estate in fee was conveyed to a man and his wife, they were held to be neither joint tenants nor tenants in common. Considered as one person in law, they could not take the estate by moieties." See also *Ketchum v. Walsworth,* 5 Wis. 95, 102 (68 Am. Dec. 49); 19 R. C. L., p. 1101, § 124.

Without attempting to decide what actually was intended by the language we have just been considering, it is obvious that the parties to the agreement did not intend that both the real and the personal property should be held by them as tenants by the entireties, even if it were possible for the parties to create by contract such an estate in personal property.

The second main paragraph of the contract provides that within 10 days from the date thereof all

deeds, notes, mortgages, etc., "shall be legally transferred to conform to the terms of this agreement". And the last paragraph provides that within 10 days from the date of the contract "a joint agreement shall be entered into by and between the parties hereto relating to the disposition of said joint property, in the event of the death of one, and in the event of the death of both of the parties hereto". The same length of time is allowed to make a legal transfer to conform to the terms of the contract that is given to provide for the disposition of the property upon the death of the parties to the contract. It undoubtedly was intended that the transfer was not to be made until some agreement had been reached as to the final disposition of the property upon the death of both parties. This final disposition was a material and integral part of the contract between the parties and it was never intended by them that a transfer should be made by the defendant to the plaintiff of the property standing in her name, until an agreement had been concluded as to the last clause of the contract, directing final disposition of the property. This is made clear by the further fact that the contract itself provided that all agreements or wills relating to the property were canceled by the agreement of September 11, 1933.

If the creation of an estate by the entirety had been attempted, it would not have been necessary to include in the contract a provision for a further agreement as to the final disposition of the property upon the death of the parties to the contract. Such an agreement would be inconsistent with the proposition that the property should be held by the entirety.

■ The contract involved in this suit is not definite in its terms and does not contain all the terms and

conditions intended by the parties to be settled before it should become effective. One of the component parts of the contract is merely to make a contract sometime in the future. It is therefore not enforceable, because a material part thereof, that is, the agreement for a final disposition of the property, is left open to future negotiations between the parties and neither party can be compelled to accept the offer of the adversary party: *Holtz v. Olds,* 84 Or. 567 (164 P. 583, 1184).

In 6 Page on Contracts (2d Ed.), p. 5783, § 3281, it is said:

"To be enforceable, either at law or in equity, a contract must be definite and certain. Certainty is especially necessary if specific performance is sought, since the court must necessarily decree performance of the contract in such terms that the party against whom the decree is entered can ascertain from the decree itself what he is bound to do; and unless the contract itself is definite, the court can not frame a definite decree. The same idea is expressed in other words when it is said that the court can enforce a valid contract by specific performance, but that it can not make a contract for the parties if they have not made one for themselves in sufficiently definite terms. Accordingly, specific performance may be refused because the contract is indefinite and uncertain, although damages may be recovered at law.

"If the so-called contract leaves certain terms open for future negotiations between the parties it is evidently incomplete, and neither party can be compelled, in such future negotiations, to accept the offer of the adversary party. Specific performance is, accordingly, refused in cases of this sort."

In *Harter v. Morris,* 72 Ind. App. 189 (123 N. E. 23), the court clearly stated the law relative to the granting of specific performance, in the following language:

"An application for specific performance is not a matter of right, but is addressed to the sound discretion of the court, in view of all the circumstances. The application of the principle is guided by established rules and practice in equity, which are advisory rather than mandatory. The contract must be certain, just, and equal in all its parts, and for an adequate consideration. It must not have been obtained under unfair circumstances, and it must not be hard or unconscionable. It must be capable of being performed without adding to its terms, and nothing must be left to the future. It must appear that the plaintiff has no adequate remedy at law, and that a refusal to perform the contract would be a fraud upon him. It is not necessary that the plaintiff be convicted of fraud in order that specific performance be denied him. There may even be no blame attached to him; but, if there is a want of equality and fairness within the contract itself, the court will not exercise its extraordinary jurisdiction in specific performance. In determining the fairness of the contract, the court will look to the surrounding circumstances, such as incapacity, or inequality of the parties, the manner of the execution of the contract, the experience or inexperience of the contracting parties, and their opportunity to advise with others of experience in such transactions. If greater wrong is likely to result to the defendant on account of the granting of specific performance than the plaintiff will suffer in case it is withheld, equity will deny it. The court will consider the facts that the plaintiff has not parted with any consideration, and that he is *in statu quo* at the commencement of the suit:" Citing many authorities.

See, also, in this connection: *Wheelock v. Wheelock,* 97 Ind. App. 501 (187 N. E. 205); *Colson v. Thompson,* 2 Wheat. 336 (4 L. Ed. 253); 5 Pomeroy's Equity Jurisprudence (2d Ed.), p. 4822, § 2190; *Ramsey v. Wellington Co.,* 114 Or. 355, 370 (235 P. 297); 25 R. C. L., p. 221, § 20.

The contract in the case at bar, as we have pointed out, is not only incomplete but indefinite and uncertain. Furthermore, it is inequitable. Plaintiff's entire case seems to be based upon the alleged fact that the parties had, 32 years prior to the trial of the case, entered into an oral agreement as to the manner of holding their joint earnings. He has failed utterly to prove the allegations concerning such oral agreement. By the contract which he seeks to enforce he is attempting to acquire an interest, apparently not less than one-half, in the life earnings of his wife. In view of the indefiniteness and incompleteness of the contract and its lack of equity, specific performance should be denied.

There are a great many other facts and legal questions presented in the briefs, which we deem it unnecessary to discuss specifically. Many of those questions involve the alleged acts of the defendant in concealment and disposal of her property. We are fully aware of the fact that courts look with favor on compromises and family settlements, and the authorities cited to that point have been considered by us. But they are not applicable here.

The decree of the circuit court is affirmed.

RAND, J., dissents.