Argued September 23, affirmed November 25, 1953

# SLAYTER *v.* PASLEY
264 P. 2d 444

George P. Winslow, of Tillamook, argued the cause and filed briefs for appellant.

Norman L. Easley argued the cause for respondent. On the brief were Easley & Whipple and Carl Robert Wells, of Portland.

Before LATOURETTE, Chief Justice, and WARNER, TOOZE and PERRY, Justices.

WARNER, J.

This is an action to recover damages in a very substantial amount arising from defendant's alleged refusal to grant an extension under the terms of a written lease. A trial was had before the court without a jury and from a judgment in favor of defendant, plaintiff appeals.

On April 9, 1947, the defendant Lutie Pasley, as the owner of a building situated in the business center of Tillamook, Oregon, entered into a lease with one Gustafson and one Juhnke, demising this property to

said parties for a term of three years beginning May 1, 1947, and terminating April 30, 1950. Thereafter, the tenants named conducted a grocery business thereon until January 23, 1948, when, with defendant's consent, they assigned their interest in the lease to the plaintiff W. E. Slayter, who continued the same kind of business on the premises until April 29, 1950.

The provision of the lease which gives rise to the instant litigation reads:

"* * * it is further agreed that the Lessees herein or those having their rights in the property at said time may have an option for an extension of the period covered by this lease, the amount of the rental of the premises to be agreed upon at that time. If no agreement can be made within a period of thirty days prior to the expiration of this lease, then this lease shall expire upon the date provided for herein."

Several months prior to April 1, 1950, the plaintiff exercised his right of option for an extension and commenced negotiating with the defendant for a rental rate for such extended period. When the parties failed to reach an accord on the rate of the future rental, plaintiff vacated the property. We shall hereinafter refer to plaintiff as the lessee and the defendant as the lessor.

The lessee accuses the lessor of negotiating in bad faith and in an arbitrary and capricious manner. He claims that the lessor was bound to accept, in the absence of an agreement between them, whatever amount was determined by the court to be a reasonable rental for the new term. He asserts that notwithstanding that the lease, as here, sets up no such criterion or method by which a future rental can be fixed, the court is bounden, nevertheless, to enforce such an uncertain and

vague provision by applying what appears to be a "reasonable rental" rate. The rule which appellant urges us to apply to the instant lease, although followed in a limited number of other states, is one of first impression in this jurisdiction.

The lessor rests upon the proposition that the extension provision did not obligate her to agree to a reasonable rental and argues that, in essence, the so called option for extension was no more than an agreement to agree in the future and, as such, was void for uncertainty.

The lessee's success in this appeal depends upon whether or not this court is empowered to imply from the option clause hereinabove written an intent that the extension was to be at a "reasonable rental".

The appellant relies heavily upon *Edwards v. Tobin et al.*, 132 Or 38, 284 P 562, 68 ALR 152, apparently laboring under the impression that it commits us to employ it in this matter as a complete answer to his problem.

It is important to this opinion to note that the Tobin case marks a deviation from the majority rule. This departure is suggested by the opinion itself (132 Or 43). It is also emphasized in *Marnon v. Vaughan Motor Co., Inc.*, 184 Or 103, 165, 194 P2d 992. The appellant also seems to believe that there is but one minority rule and that such rule embraces the specific doctrine of judicial latitude which he contends for here. It certainly is not correct to so evaluate the Tobin case if to so do is intended to imply that there is a complete unanimity of thought and principle between all the cases which are not in accord with the majority rule. It is not difficult to discover that those cases which have declined to follow the majority rule fall into two separate groups or classifications. Each group is dif-

ferent from the other in the extent the court was willing to go in order to give vitality to an option for the renewal or extension of a given lease. We are, therefore, impelled to inquire first as to which branch of the minority holdings the Tobin case properly belongs.

■ The majority rule, in essence, is that a provision for the extension or renewal of a lease must specify the time the lease is to extend and the rate of rent to be paid with such a degree of certainty and definiteness that nothing is left to future determination. If it falls short of this requirement, it is not enforceable. 32 Am Jur 806, 810, Landlord and Tenant §§ 958, 965; 51 CJS 596, Landlord and Tenant § 56(b); 3 Thompson, Real Property perm ed 360, § 1263.

The cases which depart from the strictures of the majority rule can be readily correlated into two separate divisions. The first of these classifications includes holdings wherein the fundamental rule appears to be that the option provision will be enforced if it comprehends a clear and definite basis or mode whereby a court can determine the future rental if the parties themselves cannot agree on such a rate. Insofar as that line of cases demands certainty of expression as to what the parties have agreed upon in this respect, they cleave to the majority rule; but, unlike the majority rule, instead of demanding a degree of certainty which leaves nothing to future determination, the law is yet satisfied if the provision clearly establishes a mode for ascertaining the future rental rate, as by arbitration, or, in the alternative, by expressly declaring for a "reasonable rental" during the extension period or by employing words or phrases which of themselves clearly connote or are legally synonymous with "reasonable rental". The decisions falling within this bracket do not resort to discovery of intent by im-

plication but find the answer in the express words employed by the parties. We will hereinafter refer to this as the first minority rule.

An examination of the authorities coming within the first minority classification confirms the conclusion that such a rule is not, in precise parlance, a minority expression diametrically opposed to the majority rule but, in fact, one which only countenances a more liberal extension of the majority rule under certain circumstances. The essential difference between the first minority rule and the majority rule lies not in the degree of the clarity of the agreement as written but rather in the time when the detail of the future rental charge shall first be made evident. The majority rule mandates its determination coincident with the execution of the original lease. It leaves nothing with respect thereto to future negotiation or agreement. On the other hand, the minority rule under discussion in effect waives prior exact determination of the future rental rate and suffers the parties to establish it at a future time, provided, however, that their leasing instrument definitely sets up a mode for implementing its later ascertainment, as by arbitration, or, in lieu of such mechanism, employs express language of sufficient certainty to justify a court in holding that the extension provision contemplates that the future rentals should be at a reasonable rate to be ascertained as of a date proximating the beginning of the extension period.

The cases which follow exemplify application of the first minority rule.

*Kaufmann v. Liggett,* 209 Pa 87, 58 A 129, 67 LRA 353 (1904) is one of those relied upon by this court in support of the doctrine in *Edwards v. Tobin et al.,* supra. There the dispute arose by reason of the failure of the mode provided by the parties for fixing the

rental, i.e., by arbitration. The court declined to compel an arbitration but, in lieu thereof, undertook to attain the same result by fixing a fair rental and thereafter enforcing specific performance at that rate. A doctrine of similar import has long since been applied by this court to a lease carrying a provision for arbitration in the event of disagreement between the parties. See *Houston v. Barnett,* 90 Or 94, 103, 175 P 619 (1918).

The lease in *Bechmann v. Taylor,* 80 Colo 68, 249 P 262, referred to with approval in the Tobin case, contained a clause for renewal " 'at what the rent will be worth at that time' " and where it was held to be equivalent to "the fair market rate—i.e., the reasonable rate—at the date of renewal." *Arnot v. Alexander,* 44 Mo 25, 100 Am Dec 252, is another citation found in the Tobin opinion. In the Arnot case the grant of a renewal was made contingent that " 'said parties can agree upon terms, *or that said lessee is willing to give as much as any other responsible party will agree to give'* " (Italics ours.) Concerning the italicized phrase, the court observed:

"* * * Leaving the amount of rent for the renewal term of the lease to be ascertained by what responsible parties would agree to pay for the use of the premises fixes the rent with as much certainty as though it were to be determined by a board of appraisers to be selected by the parties to the lease, each selecting one, with authority in these to select a third in case the two should disagree. The standard of valuation would be the same in both cases, to wit, the rentable market value of the premises at the time the valuation should be made. If the court may hear evidence, and ascertain for itself the value when the appraisement fails through a refusal to appoint an appraiser, why may it not hear evidence and decide the value when the appraisement fails from some other cause? * * *"

*Greene v. Leeper,* 193 Tenn 153 245 SW2d 181, construed a lease renewal provision reading " ' 'at a rental to be agreed on according to business conditions at that time' ' ". It was read by the court as contemplating a reasonable rental. It will be observed that in the foregoing four cases, and many others of like tenor, the characteristic factor which differentiates them from the rule contended for by the instant lessee is that the provision for the future determination of rentals carries either a mode to implement its attainment or fixes a standard which will enable a court to declare that a "reasonable rental" was in the contemplation of the parties.

The other rule, for convenience called the second minority rule, unlike the first minority rule, is in direct conflict with the majority rule. It does not place a premium on certainty and definiteness. Unlike the first minority rule, it is made the basis for enforcing an option provision even though such provision supplies no method for the determination of the future rental rate or any standard whereby the court can measure the intent of the parties with reference thereto. It is enough for the enforceability of such provisions that the courts find therein an agreement of the parties to meet at a future date for the purpose of making a further agreement on the subject of rental. Finding a provision of that vague and indefinite character, the courts following the second rule are content to hold that it bespeaks a mutual agreement for reasonable rental. The reasons for such holdings are various. Some conclude that such language creates a legal presumption of such intent, others find support from other provisions in the lease, and others even give consideration to extrinsic facts, such as the tenant's improvements, as warranting such a legal conclusion.

The following cases are a few which fall in this category and illustrate its application.

In *Young v. Nelson,* 121 Wash 285, 209 P 515, 30 ALR 568, the matter of rental during the extended period was " 'at such rental as may then be agreed upon' ". It will be noted that the parties thereby furnished no standard whereby the court could make a determination for them in the event of disagreement. The court thereupon and without more read the contract as if the words "reasonable rental" were originally written into it.

A lease with substantially the same clause was by implication construed with a similar result in *Hall v. Weatherford,* 32 Ariz 370, 259 P 282, 56 ALR 903; so, too, in *Bird v. Couchois,* 214 Mich 607, 183 NW 36, where the matter of rentals on extension was left to be " 'determined by the party of the first part [the lessor]' ". *Moss v. Olson,* 148 Ohio St 625, 76 NE2d 875, 876, involved a renewal provision in these words, " 'the rental to be paid for said renewal period to be subject to agreement between the parties at that time.' " Notwithstanding the want of some criterion or mode for its determination, the Ohio court interpreted it as an agreement for reasonable rental. The strong dissenting opinion of Mr. Chief Justice Weygandt in that case is worthy of examination.

*Rainwater v. Hobeika,* 208 SC 433, 38 SE2d 495, 166 ALR 1228, is another example of cases cited by plaintiff which fall under the second minority rule. There the future rental clause was in terms of a " 'price agreed upon at that time' ", and no more, and was implied to be an agreement for "reasonable rental".

Further cases falling within the first and second minority groupings will be found in the annotation to

6 ALR2d 448, 166 ALR 1237, 68 ALR 157 and 30 ALR 572.

■ We now give our attention to the rule by which *Edwards v. Tobin et al.,* supra, 132 Or 38, is controlled. In so doing, it is well to recall first that no decision has any authoritative value beyond the proportions established by its controlling facts. *In re Peterson's Estate,* 230 Minn 478, 42 NW2d 59, 18 ALR2d 910. Also see *In re Frazier's Estate,* 180 Or 232, 245, 177 P2d 254, 170 ALR 729; *Smith v. Pacific Truck Express,* 164 Or 318, 332, 100 P2d 474. It is the prongs of fact which securely attach the jewel of legal principle to its proper setting.

Both in terms of its factual circumstances and its legal pronouncements, the Tobin case definitely belongs to what we have hereinbefore denominated as the first minority rule.

The significant phraseology of the lease therein reviewed reads, " 'said rental *to be a reasonable rental* under the then existing conditions.' " (Italics ours.) Unlike the instant lease, we there find a clear-cut statement of the parties agreeing (1) on the criterion for its ultimate determination and (2) on the time when the reasonableness of the rate shall be computed. The standard by which the renewal rentals were to be determined in the Tobin case was so clearly patent that there was no occasion for the court to speculate on lesser criteria, if any.

The law governing the court's final conclusion is stated with equal clarity. The court first reiterates its fidelity to the rule mandating definiteness of statement and intent as a condition precedent to the enforceability of contracts and, in so saying, to that extent follows the majority rule. This part of the opinion reads as follows (132 Or 41): "It is fundamental that equity will not

decree specific performance of a contract which is vague, indefinite and uncertain, nor will it make a new contract for the parties. * * *'' It then proceeds to make an exception to the strictures of the majority rule in these words: ''* * * It may, however, in the furtherance of justice, compel a party to do that which in equity ought to have been done and [1] which was in contemplation of the parties *as expressed in their contract,* [2] assuming there is no adequate remedy at law * * *'' (italics ours), and, in so doing, aligns it with the first minority rule.

Thus we are taught by the Tobin case that equity, without making a new contract for the parties by the insertion of words omitted from the instrument, will look to the language of the lease option to discover existing words or phrases of sufficient clarity to enable the court to give appropriate relief in terms of what is therein expressed. In the Tobin decision the key words warranting equitable interposition were '' 'said rental to be a reasonable rental under the then existing conditions.' '' Thereupon the court, instead of having to interpolate ''reasonable rental'', as done in cases falling within the second minority rule, proceeded to give vitality to what was already written into the lease. As was said in that case, at pages 42-3:

''* * * The method of determining the rent pertains more to form than to substance. It was not the essence of the contract but was merely incidental * * * thereto * * *.

''* * * It is not a question of making a new contract for the parties, but it is rather one of compelling the doing of that which was *plainly contemplated.* * * *'' (Italics ours.)

The foregoing conclusions with reference to the Tobin holding find support in the further statements

found in that opinion, i.e., that equity will enforce lessee's rights when the acts of the landlord are "in violation of *the plain import of his agreement*"; and "The vital question is: Is the clause in the lease providing for renewal too indefinite and uncertain to enforce?" (132 Or 42-3) (Italics ours.)

The Tobin case so definitely emphasizes the necessity for a species of definiteness so clear that the provisions of the agreement can be enforced that no comfort can be garnered by the appellant from that holding.

Our conclusions concerning the character and proper placement of the Tobin case do not, however, end our inquiry nor absolve us from the duty of deciding whether we should abandon the principles controlling in that case and embrace the other and more liberal second minority rule urged upon us by the appellant lessee.

The majority holdings, as well as the deviations therefrom, reflected by *Edwards v. Tobin* et al., supra, have as their basic foundation that long existent precept of contract law, namely, that an agreement to make a contract is not binding unless all the terms and conditions are agreed upon, and nothing is left to future negotiation. See *Gamet et al. v. Coop et ux.,* 182 Or 78, 87, 185 P2d 670; *Reed et al. v. Montgomery,* 180 Or 196, 220, 175 P2d 986; *Alexander v. Alexander,* 154 Or 317, 332, 58 P2d 1265; *Newport Construction Co. v. Porter,* 118 Or 127, 134, 246 P 211; *Beall v. Foster,* 95 Or 39, 42, 186 P 554; *Holtz v. Olds,* 84 Or 567, 577, 164 P 583, 1184; *Gregory v. Oregon Fruit Juice Co.,* 84 Or 199, 202, 164 P 728. Also see *Bevan v. Templeman,* 145 Or 279, 288, 26 P2d 775. In *Holtz v. Olds,* supra, Mr. Justice BURNETT wove it firmly

into the fabric of our own jurisprudence with the following statement, at page 578:

> "It is indeed competent for parties to enter into a preliminary agreement looking to the execution of a consequent one in the future. We have daily examples of that kind in bonds for deeds or in contracts for insurance, the policies of which are yet to be issued. But in all cases the minds of the parties must meet on the terms not only of the present convention, but also as to those of the covenants yet to be executed. If this rule be not observed in the stipulation and a substantial part is left open for further settlement *without a canon by which the subsequent negotiations may be controlled* there is no *aggregatio mentium* so essential to every contract. Tested by this standard, under the authorities cited, the admitted document was void for uncertainty in a material particular and was devoid of obligatory force upon the parties. * * *" (First italics ours.)

In our opinion, the italized phrase in the foregoing quotation affords a significant justification for the law employed in the solution of *Edwards v. Tobin et al.,* supra, for in the lease there construed we find "a canon by which the subsequent negotiations may be controlled." There the canon, criterion or test for the future rental rate was established as "a reasonable rental under the then existing conditions." *Edwards v. Tobin et al.,* supra. Also see *Smith v. Vehrs,* 194 Or 492, 499, 242 P2d 586.

We should be hesitant about completing an apparently legally incomplete agreement made between persons sui juris enjoying freedom of contract and dealing at arms' length by arbitrarily interpolating into it our concept of the parties' intent merely to validate what would otherwise be an invalid instrument, lest we inadvertently commit them to an ostensible agree-

ment which, in fact, is contrary to the deliberate design of all of them. It is a dangerous doctrine when examined in the light of reason. Judicial paternalism of this character should be as obnoxious to courts as is legislation by judicial fiat. Both import a quality of jural ego and superiority not consonant with long accepted ideas of legistic propriety under a democratic form of government. If, however, we follow the urgings of the lessee in the instant matter, we will thereby establish a precedent which will open the door to repeated opportunities to do that which, in principle, courts should not do and, in any event, are not adequately equipped to do.

The fundamental doctrine of the Holtz case is both sound and salutary. We decline to subtract from its vitality by the erosive effect of special concessions to special types of contracts, in this instance, a lease option.

■ Thus far we have given consideration to only one part of the option clause and no attention to the last sentence of that provision reading: "* * * If no agreement [i.e., as to the amount of rental on extension] can be made within a period of thirty days prior to the expiration of this lease, then this lease shall expire upon the date provided for herein."

We find no counterpart of a condition of this character in any of the lease option agreements which are brought to our attention through the avenue of any citations of plaintiff, nor indeed in other cases which we have examined, except as hereinafter noted. Although novel in idea and function, it nonetheless is an important interpretive aid in discovering and defining the intent of the parties.

The appellant urges that the foregoing sentence does not change the legal effect of the option and is

surplusage so far as interpretation of the forepart of the option clause is concerned. We cannot subscribe to this proposition. He also argues: "* * * Probably, the primary purpose and intent of this sentence was to require the tenant to exercise his option more than 30 days prior to the expiration of the lease. * * *" It necessarily has this effect, but not exclusively so. If the only purpose was to limit the time within which the appellant should exercise his so called option, then why such circumlocution of words to express such a simple idea? We are persuaded that the prime function of this sentence was to limit the time for the parties to reach a rental agreement and that they were alert to the fact that such negotiations might prove difficult to accomplish, notwithstanding the good faith of the negotiators. This thought attains further substance when we examine the original rental clauses. There provision was made not for a "reasonable rental", in the legal connotation of that phrase, but for a rental with a minimum floor and fluctuating ceiling, i.e., $300 per month plus one and one-half per cent of the annual gross sales of the lessee in excess of $240,000. It is the last and most solemn statement of the mutual accord of the parties wherein they set down their ideas of a proper formula for the lease rentals.

We have been cited to only one case carrying a future rental provision similar to the one we are here reviewing and including a terminating provision in the event they cannot agree. In *State v. Blair,* 351 Mo 1072, 174 SW2d 851, 852, the Missouri court had occasion to construe the meaning of that part of a lease which conferred on the lessee the " ' "right to lease said described property at the end of this term of lease

for another term, provided that first parties [lessors] \* \* \* and second party [lessee] can agree on rental terms; and *if said parties do not agree, the second party agrees to vacate said described property at the expiration of this lease.*" ' " (Italics ours.) The negotiations failed and the lessors sued for ejectment. The court held, at page 854:

> " "\* \* \* It is apparent that the original lease did not constitute a contract for renewal, nor grant an option to renew for a further term. No terms for renewal were agreed upon. All terms were subject to future negotiation. *No method was provided for the determination of terms.* The provision for renewal, if the parties could 'agree on rental terms,' was void under the statute of frauds. \* \* \*" (Italics ours.)

It further added: "\* \* \* The terms of the original lease imposed no legal duty on either party to submit proposed terms for a renewal. \* \* \*" Also see *Arnot v. Alexander,* supra, 44 Mo 25.

It is apparent to us that the parties to the lease here were conscious of a possible disagreement and sought to prevent an interminable controversy between them by limiting the period of negotiation, as reflected in the last sentence of the option clause. Certainly, they had a right to anticipate such a contingency when the rental pattern for the original term was a fluctuating one reflecting the vicissitudes of the lessee's business and, in a sense, making the lessor a prospective participant in the business income.

■ To attempt by judicial fiat to substitute the legal concept of "reasonable rental" in lieu of the previously followed design of a fluctuating rental, measured by future uncontrolled and uncontrollable conditions, would, indeed, be to remake the contract for the parties

and very possibly frustrate what to us appears to be a very important contrary intent concerning the rental amount. Certainly, the pattern of their very carefully worked out methods of arriving at the amount of rent and checking the gross business operations of the lessee affords no justification for us to say they had a radically different basis in mind for the future leasing, especially when a goodly portion of the lease instrument is devoted to that end.

The judgment of the circuit court is affirmed.