*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 21-CV-416 & 21-CV-417

U STREET MUSIC HALL, LLC, APPELLANT,

V.

JRC STANDARD PROPERTIES, LLC, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CAB-851 & 2019-LTB-13318)

(Hon. Robert R. Rigsby & Hon. Gregory E. Mize, Trial Judges)

(Submitted September 14, 2022                    Decided December 15, 2022)

*Timothy R. Clinton* was on the brief for appellant.

*Stephen O. Hessler* and *Ian G. Thomas* were on the brief for appellee.

Before BECKWITH, MCLEESE, and ALIKHAN, *Associate Judges*.

ALIKHAN, *Associate Judge*: Appellant, U Street Music Hall, LLC ("U Hall"), appeals the Superior Court's order granting appellee JRC Standard Properties, LLC's ("JRC") motion for summary judgment and denying U Hall's cross-motion for summary judgment. In so ruling, the trial court held that the parties' lease agreement failed to adequately set out definite price terms. Because we (1) conclude

that the annual base rent set forth in the lease's option clause is legally synonymous with reasonable rent (and is thus enforceable under our prior decisions) and (2) adopt a rule enforcing option contracts that leave the ultimate price to be agreed upon later, we reverse and remand.

## I. Factual Background and Procedural History

### A.     Lease Negotiations

In 2009, U Hall and JRC began negotiating a lease for real property located at 1115 U Street, NW.  During these negotiations, the parties discussed an option provision that would allow U Hall to renew the lease at the end of the original lease term ("the Option").  JRC sent U Hall an early draft of the lease, which included the following language under Section 2.02, entitled "Term Renewal Option":

> (a) Provided Tenant is not in default at time of exercise of the Option and Tenant has not sublet its interest in the Premises (further provided Landlord has consented to same), and provided that this Lease shall not theretofore have been terminated, Tenant shall have the option (the "Option") to extend the term of this Lease for two (2) additional terms ("Option Term") of Five (5) years each (i.e. the total term of any extensions shall not exceed Ten (10) years), commencing on the Tenth (10th) anniversary of the Rent Commencement Date and ending on the date no later than the Twentieth (20[th]) anniversary of the Rent Commencement Date, upon the same terms and conditions contained herein except that the Annual Base Rent for the Option Term shall be as follows:

Below that provision, the draft depicted the following table with unfilled values for the base rental price ("Annual Base Rent") for each Option year:

| Option Year Rent | Annual Base Rent |
|---|---|
| 1 | $ |
| 2 | $ |
| 3 | $ |
| 4 | $ |
| 5 | $ |
| 6 | $ |
| 7 | $ |
| 8 | $ |
| 9 | $ |
| 10 | $ |

The parties later circulated another draft with a similarly unfilled table (but limiting the Option's term to five years instead of ten).

## B.    Terms of the Final Lease

After further negotiations, the parties executed a lease to run from September 1, 2009, to August 31, 2019.[1]  They ultimately failed to agree on specific dollar figures for any of the Option's yearlong terms.  Instead, Section 2.02 of the lease reads:

> (a) Provided Tenant is not in default at time of exercise of the Option and Tenant has not sublet its interest in the Premises (unless Landlord has expressly consented to such

---

[1] The lease provides that it is to be governed by District of Columbia law.  It also contains integration and severability clauses.

assignment), and provided that this Lease shall not theretofore have been terminated, Tenant shall have the option (the "Option") to extend the Term of this Lease for one (1) additional term ("Option Term") of Five (5) years. *The Annual Base Rent during any Option Term shall be based on a Fair Market Value rental rate applicable at the expiration of the initial Term. The Annual Base Rent during any Option Terms shall escalate on an annual basis at a rate agreed to by both the Landlord and Tenant.*

(b) Tenant may exercise its Option only by delivering binding written notice ("Tenant's Option Notice") to Landlord of Tenant's election to exercise the Option not later than six (6) months prior to the Expiration Date of the Term.

### C.    U Hall Attempts to Execute the Option

In 2018, a U Hall representative emailed JRC "in regard to the renewal of the U Street Music Hall lease." JRC responded, noting that the lease's "initial term expires [i]n Sept 2019," that U Hall had "one five year option," and that it "only need[ed] to notify the Landlord to activate the Option Term." U Hall replied that "[t]he option is at Fair Market Value, which is open for discussion." Around two weeks later, after unproductive deliberations between the parties about what would constitute "fair market value," JRC reiterated that "[t]he lease has one five year option," and directed U Hall to "please . . . send a letter to" JRC's representative "[i]f the tenant would like to exercise [its] option."

A few weeks later, U Hall emailed JRC that it "would like to formally exercise [its] option to renew per the terms outlined in [its] current lease." JRC then sent U Hall a document titled "FIRST AMENDMENT TO LEASE AGREEMENT." This proposed amendment would have fixed the Option rent at specific dollar figures, but the parties ultimately did not agree on these prices.

In February 2019—within the six-month window to exercise the Option— U Hall sent JRC a "letter constitut[ing] formal and binding notice . . . of U Street Music Hall, LLC's exercise of its right to extend the lease for one additional term of five years."

### D. Litigation Ensues

Independent of the brewing dispute about whether U Hall could properly exercise the Option, JRC filed a complaint in Superior Court in June 2019, alleging that U Hall had failed to pay approximately $122,000 in rent owed from December 1, 2018 to June 30, 2019. The parties cross-filed motions for summary judgment. The trial court denied JRC's motion and partially granted U Hall's, finding, among other things, that U Hall was already "entitled to a credit in the amount of $177,516.92 for improperly charged property management fees through the end of 2018."

In January 2020, JRC sent U Hall its annual "true up" billing statement as permitted under the lease. In it, JRC claimed that the lease's original term had expired on August 31, 2019, and that JRC was deeming U Hall to be a holdover tenant from September 2019 to January 2020. Accordingly, JRC charged U Hall "200% of the Base Rent of the final month of the Lease Period."[2]

U Hall moved for partial summary judgment in the preexisting suit, arguing that it had properly executed the Option. Two hours later, JRC brought a new suit in Superior Court, seeking a declaration that U Hall had *failed* to exercise the Option.[3] The parties cross-filed motions for summary judgment in the new case. Granting JRC's motion and denying U Hall's, the trial court held that JRC had properly considered U Hall a holdover tenant because the Option was not

_____

[2] Article 14 of the lease provides, in pertinent part:

> If Tenant remains in possession after the expiration or sooner termination of this Lease . . . without Landlord's written consent, Tenant shall pay Landlord . . . an amount equal to the greater of (i) two hundred percent (200%) of the Monthly Base Rent plus all additional rent payable for the last month of the Term, and (ii) the fair market rental value of the Premises, for each month or portion thereof that Tenant remains in possession following the Expiration Date . . . .

[3] The trial court consolidated the two cases.

enforceable. In so ruling, the court mistakenly relied on the earlier draft of the lease that included the unfilled Option rent chart. It reasoned:

> That the Option states the Annual Base Rent will be "a rate agreed to by both" Parties and is accompanied by an unfilled chart for Annual Base Rent under the Option lends to the conclusion that the Parties intended to revisit the matter and determine [the] Property's Fair Market Value.

In other words, the trial court held that the Option did not set sufficiently definite price terms to be enforceable. U Hall moved for reconsideration based on the court's error, but it withdrew the motion after it was pending for 30 days and appealed to this court.

## II.    Standard of Review

Our standard of review is the same whether we review one motion for summary judgment or, as here, two cross-motions. *See Fisher v. Gov't Emps. Ins. Co.*, 762 A.2d 35, 39 (D.C. 2000). "To prevail on a motion for summary judgment, a party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001). In determining whether a party has satisfied this standard, we view the record in the light most favorable to the nonmoving party. *Id.* But where "there is no dispute as to the relevant facts in th[e] case, we need only determine

whether the trial court properly applied the substantive law." *Fisher*, 762 A.2d at 39. Ultimately, we review the grant or denial of summary judgment de novo. *Id.*

### III. Discussion

On appeal, U Hall argues that the Option is binding and enforceable. It first contends that the Annual Base Rent, fixed at the "Fair Market Value rental rate applicable at the expiration of the initial Term," is "legally synonymous with 'reasonable rent.'" And it further asserts that even "in the absence of agreement on rent escalation," the ultimate rental figure for the years subject to escalation should be based on the same "Fair Market Value" rate set out for the Annual Base Rent.

JRC counters that "fair market value" is a "vague and indefinite term." "But even assuming *arguendo* that tying base rent to 'fair market value' for the first year [of the Option term] was sufficiently definite," in its view, the escalation clause renders the Option void because the escalation rate is "not tied to any measuring stick whatsoever."[4]

---

[4] JRC does not dispute that, if the Option is valid and enforceable, U Hall properly executed it. Although JRC does claim that U Hall's February 4, 2019, letter could not legally exercise the Option, in support thereof, JRC merely reiterates its substantive arguments as to why the Option is invalid. It does not argue that U Hall failed to employ the correct *procedures* to execute the Option. That is for good reason—a review of the record confirms that U Hall clearly complied with the Option's execution procedures.

We agree with U Hall that both the Annual Base Rent and the escalation clause are enforceable, and thus we reverse and remand.

**A.    Annual Base Rent**

"Leases of real property are analyzed under established principles of contract law." *2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 86 (D.C. 2019). "An 'option' is a type of unilateral contract." *Prison Health Servs., Inc. v. Baltimore County*, 912 A.2d 56, 61 (Md. Ct. Spec. App. 2006). As a general matter, for a contract to be enforceable, its material terms—"*e.g.*, subject matter, price, payment terms, quantity, quality, and duration"—must be "sufficiently definite so that the parties can be reasonably certain as to how they are to perform" and "clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (first quoting *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990); then quoting *Duffy v. Duffy*, 881 A.2d 630, 638 (D.C. 2005); and then quoting *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 327 (D.C. 2001)). At the same time, "[t]he requirement of definiteness cannot be pushed to extreme limits," and inherent in all agreements is "some degree of indefiniteness and some degree of uncertainty." *Rosenthal*, 573 A.2d at 370.

Accordingly, we have held that an option's price provision suffices if it "clearly establishes a mode for ascertaining the future rent[] by employing words or phrases which of themselves connote or are legally synonymous with 'reasonable rent.'" *George Y. Worthington & Son Mgmt. Corp. v. Levy*, 204 A.2d 334, 337 (D.C. 1964); *see Groner v. Dryer*, 256 A.2d 559, 560, 563 n.5 (D.C. 1969) (noting that an option clause "provid[ing] for arbitration in the event the parties were unable to agree on an adjusted rental" was enforceable). In *Levy*, the parties' option was to extend the lease for a five-year term "at a rental [price] to be agreed upon by both parties, [with] such agreement to be based upon the prevailing fair rentals for similar property at that time." 204 A.2d at 335. We held that this language fixed the price to "a definite criterion" and thereby "render[ed] the provision enforceable." *Id.* at 337.

The present Option's Annual Base Rent—"Fair Market Value . . . applicable at the expiration of the initial Term"—provides a similarly definite criterion. Although the Option does not set forth a specific dollar figure, its baseline price is "synonymous with 'reasonable rent'" and ties the base price to an ascertainable figure. *Id.* On remand, the trial court can determine fair market value. *See, e.g.*, *Withers v. Wilson*, 989 A.2d 1117, 1121 (D.C. 2010); *Basiliko v. Pargo Corp.*, 532 A.2d 1346, 1350 (D.C. 1987).

## B. Escalation Clause

Our inquiry does not end with the Annual Base Rent, however, because the Option's price provision also contains an escalation clause. That clause instructs that the "Annual Base Rent during any Option Terms shall escalate on an annual basis at a rate agreed to by both the Landlord and Tenant." In other words, U Hall was obligated to pay only "Fair Market Value" for the first year of the Option term. But for the remainder of the term, it was obligated to pay "Fair Market Value" *plus* an additional percentage that would increase each year at a rate the parties would later agree to. The lease thus leaves the *final* rental prices for years two through five of the Option term subject to future agreement.[5]

Although we came close in *Levy*, we have never squarely opined on the question before us today: whether an option that contains a price term "to be agreed upon by the parties" at a later period is enforceable. Courts are split on this issue. Some conclude that such language renders the option unenforceable. *See, e.g., Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 544 (N.Y. 1981); *Riis v. Day*, 613 P.2d 696, 697-98 (Mont. 1980); *Walker v. Keith*, 382 S.W.2d 198, 204-05 (Ky. 1964); *Slayter v. Pasley*, 264 P.2d 444, 449-51 (Or. 1953);

---

[5] We must determine the enforceability of the escalation clause because U Hall remained on the premises for a portion of the Option's second year-long term, from September to October 2020.

*Etco Corp. v. Hauer*, 208 Cal. Rptr. 118, 120-23 (Ct. App. 1984); *Phipps v. Storey*, 601 S.W.2d 249, 251-52 (Ark. Ct. App. 1980); *Rosenberg v. Gas Serv. Co.*, 363 S.W.2d 20, 26-27 (Mo. Ct. App. 1962). The reasoning of these cases, which JRC urges us to adopt, is that future-agreement language "leave[s] no room for legal construction or resolution of ambiguity" as to the price term. *Schumacher*, 417 N.E.2d at 544. There is thus a reluctance to "remake" parties' contracts for them and bind them to material terms to which they had not explicitly agreed. *Slayter*, 264 P.2d at 451.

Other courts adopt a more liberal view, as U Hall asks us to do, invoking equitable principles to enforce options whose prices are to be fixed at a later date. *See, e.g.*, *Moolenaar v. Co-Build Cos.*, 354 F. Supp. 980, 982-83 (D.V.I. 1973); *Fletcher v. Frisbee*, 404 A.2d 1106, 1109-10 (N.H. 1979); *Cassinari v. Mapes*, 542 P.2d 1069, 1071 (Nev. 1975); *Young v. Nelson*, 209 P. 515, 517 (Wash. 1922); *Playmate Club, Inc. v. Country Clubs, Inc.*, 462 S.W.2d 890, 893-94 (Tenn. Ct. App. 1970); *see also* Daniel E. Feld, Annotation, *Validity and Enforceability of Provision for Renewal of Lease at Rental to Be Fixed by Subsequent Agreement of Parties*, 58 A.L.R.3d 500 § 2[a] (1974) (labeling this view the "modern" trend). Their reasoning is typically threefold. First, the option, "being for the benefit of the lessee, forms a part of the consideration which induced the lessee to execute the contract." *Playmate Club*, 462 S.W.2d at 892. Next, implying a price term of

"'reasonable' rent . . . effectuate[s] the intent of the parties better than would striking out the clause altogether." *Moolenaar*, 354 F. Supp. at 982. Finally, "the policy of construing ambiguities in lease agreements against the landlord" weighs against allowing a landlord to eviscerate a renewal provision for which the tenant paid consideration. *Id.* at 983.

We find this latter view—in favor of enforcing the Option—more persuasive. Two of the rationales advanced by our sister courts are particularly relevant here. First, we disfavor construing contracts in such a way as to permit "enrichment of the landlord at the tenant's expense by that portion of the rent" built into the original lease's term that presumptively served as the tenant's consideration for the option. 1 Timothy Murray, *Corbin on Contracts* § 4.3 (rev. ed. 2022); *see Allen v. Yates*, 870 A.2d 39, 52 (D.C. 2005) ("Where the parties have entered into a contract, being made whole means realizing the benefit of the bargain that they struck."). Second, JRC's attempt to cancel the Option runs headlong into both parties' clear intent— expressed in the text of the lease—to permit U Hall to extend the term if it so chooses. The Option provides that U Hall "*shall* have the option . . . to extend the Term of this Lease for one (1) additional term . . . of Five (5) years." The existence of U Hall's Option is plain on the face of the lease, and the parties manifested an intent to be bound by that term by signing the document. To allow JRC to wholly cancel certain years of the Option term would both deprive U Hall of a benefit for

which it has already paid consideration and fail to reflect these sophisticated parties' intent at the time they signed the lease. We decline to adopt an approach that would grant JRC such a windfall.[6]

We also note that the view we implement conforms to the Uniform Commercial Code, which provides that:

> The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if . . . (b) the price is left to be agreed by the parties and they fail to agree . . . .

D.C. Code § 28:2-305(1); *see id.* § 28:2-204(3) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."). While the Uniform Commercial Code pertains to the sale of goods and not property leases, it is nevertheless additional persuasive authority for the rule we adopt today.

---

[6] The third rationale relied upon by our sister courts is the presumption of construing a lease against a landlord. We have no occasion to address its potential applicability in this case because the other rationales suffice to support the rule that we adopt.

We thus hold that when a lease contains an option provision that leaves the rental price for the option year(s) to be agreed upon at a later date, a court can infer that the parties would have agreed on a reasonable rental price for each option term. *See Fletcher*, 404 A.2d at 1109 ("When an option specifies that the new rent will be mutually agreed upon, a reasonable figure is implied."). As with the Annual Base Rent, this figure "can be ascertained with reasonabl[e] certainty," which renders the Option "valid and enforceable." *Playmate Club*, 462 S.W.2d at 894.[7]

In so holding, we are mindful not to "mak[e] a new contract for the parties." *Levy*, 204 A.2d at 337. Instead, looking at the lease as a whole, we discern a manifest intent to provide U Hall a renewal option. *See id.* We are especially confident in this approach where, as here, "the agreement is a commercial one," and "it can be presumed that the parties, as actors in the market, intend a market or some other reasonable price." 1 *Corbin on Contracts* § 4.3.[8]

---

[7] Because we hold the entire Option valid, we need not address what effect the lease's severability clause would have on the Option's enforceability.

[8] JRC argues that the parties' negotiation conduct—in particular, rejecting the early drafts of the Option that would have set specific prices—evinces mutual intent to leave the Option's price terms open for negotiation and renders the Option unenforceable. But even assuming, without deciding, that we are permitted to consider such evidence in this case—given that the lease contains an integration clause prohibiting this evidence in court proceedings—it would not benefit JRC. The notion that the parties left the escalation clause open to later agreement is one of the premises on which we base our present holding.

## IV.    Conclusion

For the foregoing reasons, the judgment of the Superior Court is reversed, and this case is remanded for the trial court to determine the "Fair Market Value rental rate applicable at the expiration of the initial term" for the Annual Base Rent, as well as a "reasonable" escalation rate for September and October 2020.

*So ordered.*